FILED
United States Court of Appeals
Tenth Circuit

February 15, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

DENISE SUE CHRISTY,

     Defendant - Appellant.

No. 17-3122

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:15-CR-40091-DDC-1)**
_____

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender with her on the brief), Topeka, Kansas, for Defendant - Appellant.

Jared S. Maag, Assistant United States Attorney (Stephen R. McAllister, United States Attorney, and James A. Brown, Assistant United States Attorney with him on the brief), Topeka, Kansas, for Plaintiff - Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **O'BRIEN**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

     Denise Sue Christy stole cash from the vault of the bank where she worked as a teller. She was charged, convicted, and sentenced for various federal crimes. She now appeals.

On May 21, 2014, CNB auditors conducted a surprise audit of the Burlington, Kansas Central National Bank ("CNB" or "Bank") vault. The vault was missing $764,000. When they began to suspect Ms. Christy, she forged documents to purport that she had sent the missing cash to the Federal Reserve Bank of Kansas City ("FRB"). A grand jury indicted her on one count of bank embezzlement, six counts of making false bank entries, six counts of failing to report income on her taxes, and 10 counts of money laundering. After a six-day trial, a jury found Ms. Christy guilty of all charges except four money laundering counts.

On appeal, Ms. Christy argues that (1) cumulative prosecutorial misconduct violated her due process rights, (2) the evidence was insufficient for her money laundering convictions, and (3) the jury instructions improperly omitted a "materiality" element for the false-bank-entry charges.[1]

---

[1] Ms. Christy also argues the district court plainly erred when it failed to address her "personally in order to permit her to speak or present any information to mitigate the sentence." Aplt. Br. at 52 (brackets omitted) (quoting Fed. R. Crim. P. 32(i)(4)(A)(ii)); *see United States v. Bustamante-Conchas*, 850 F.3d 1130, 1135-36 (10th Cir. 2017) (en banc). Because we reverse her money laundering convictions and remand for resentencing, we need not address this issue.

The dissent thinks resentencing is unnecessary, *id.* at 1 n.1, predicting, based on a U.S. Sentencing Guidelines analysis, that Ms. Christy's advisory sentencing range and her sentence would be the same even without her money laundering convictions. Perhaps that would be so, but we are less certain than the dissent, whose analysis omits the district court's responsibility to "consider all of the [18 U.S.C.] § 3553(a) factors to determine" the sentence after "correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

The first factor is "the nature and the circumstances of the offense," § 3553(a)(1), and the second is "the need for the sentence imposed to reflect the seriousness of the offense," § 3553(a)(2)(A). The absence of six money laundering convictions may affect the sentencing court's view of those factors. Even if it does not, the evaluation of those

Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm the embezzlement, false bank entry, and failure to report income convictions. We reverse the money laundering convictions, vacate the sentence, and remand for resentencing.

## I. BACKGROUND

### A. *Factual History*

#### 1. Burlington CNB's Vault Management

In 2014, Elaine Gifford was the retail operations supervisor of Burlington CNB. She supervised bank teller Ms. Christy and vault teller Raylene Thorne, Ms. Christy's sister-in-law.

---

factors lies within "the traditional exercise of discretion by a sentencing court." *Koon v. United States*, 518 U.S. 81, 98 (1996).

The dissent cites no case in which we have instructed a district court to vacate multiple convictions and then declined to order resentencing. In *United States v. Michel*, 446 F.3d 1122, 1127-32 (10th Cir. 2006), this court affirmed a conviction for possession of a firearm by a felon, vacated two additional gun-related convictions for insufficient evidence, and remanded for resentencing even though the district court had given the defendant concurrent sentences of 240 months of imprisonment for each count. *Id.* at 1136. Similarly, in *United States v. Morris*, 247 F.3d 1080, 1084-85, 1091 (10th Cir. 2001), we affirmed two convictions for Hobbs Act robbery and two convictions for use of a gun during a crime of violence, reversed three other gun-related convictions as multiplicitous, and remanded for resentencing even though concurrent sentences had been imposed for the robbery and gun offenses. We see no reason to depart from this practice.

In sum, remand for resentencing adheres to our appellate role in the sentencing process. *See Koon*, 518 U.S. at 98. And not addressing the allocution issue comports with the maxim that we decide only those issues necessary to resolve an appeal. *See People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 1008 (10th Cir. 2017) ("If it is not necessary to decide more, it is necessary not to decide more." (brackets omitted) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))).

Ms. Gifford, Ms. Christy, and Ms. Thorne all had access to the Bank's vault. Ms. Gifford did not "keep much track of what was in the vault," ROA, Vol. III at 673, and Ms. Thorne often handed off her vault duties to Ms. Christy. Ms. Gifford relied on Ms. Christy to count the cash. When Ms. Gifford needed to record the amount of cash in the vault, she simply wrote down the numbers that Ms. Christy gave her.

Approximately every other week, CNB Burlington transferred money to the FRB. When the vault had too much cash,[2] the Burlington branch sent cash, also known as "sold cash," to the FRB, which held the cash in an account for the branch. The FRB sent cash back to the Bank upon request. A company named Garda transported the cash to and from the FRB.

Burlington CNB tracked its cash transfers in various ways:

(1) The Bank created cash-out tickets that recorded when money came out of the vault, including transfers to the FRB and smaller transfers to teller stations within the Bank. These tickets contained an unalterable "proof strip" recording the date they were printed.

(2) The Bank entered the cash-out transactions into an electronic system called "Vertex," which produced a report that showed the amount of cash in the vault at any given time.

(3) When the Bank sent cash to the FRB, it created a debit ticket memorializing the transaction.

(4) For each sale to the FRB, the Bank created two currency deposit tickets that itemized the denominations it sold to the

---

[2] Shortly before the audit, Steve Snook, the senior retail branch administrator for CNB, was concerned that the Burlington branch was holding too much cash—between $750,000 and $1,000,000—in its vault. ROA, Vol. III at 313-16. He instructed the Bank to "keep [its] reserves at or around 500,000 at the most," except when it needed additional money. *Id.* at 317.

FRB. One ticket went to Garda and the other stayed with the Bank.

(5) When Garda employees picked up the cash, they used a handheld machine to print out a receipt that both a Burlington CNB employee and the Garda employee signed. The receipt contained a time/date stamp that recorded the precise second the receipt was printed.

(6) Lisa Nabus, a senior accountant at Junction City CNB, balanced Burlington CNB's FRB ledger by comparing the Bank's deposits to a daily statement from the FRB.

## 2. The May 21, 2014 Surprise Audit

Leading up to May 21, 2014, Ms. Nabus noticed the following discrepancies between CNB Burlington's Vertex records and the FRB's daily statements:

(1) December 17, 2013—Ms. Christy prepared a cash-out ticket representing that the branch had sold $401,000 to the FRB when in fact it had sold only $104,000.

(2) January 14, 2014—Ms. Christy prepared a cash-out ticket representing that the branch had sold $400,000 to the FRB when in fact it had never sold the money.

(3) February 25, 2014—Ms. Christy prepared a cash-out ticket representing that the branch had sold $562,000 to the FRB when in fact it had never sold the money.

(4) March 18, 2014—Ms. Christy prepared a cash-out ticket representing that the branch had sold $270,000, $225,000, and $225,000 when in fact it had never sold any of these amounts.

(5) April 22, 2014—Ms. Christy prepared a cash-out ticket representing that the branch had sold $401,000 to the FRB when in fact the branch had sold only $101,000.

5

Although Ms. Christy adjusted the Vertex record to correct the discrepancies,[3] Ms. Nabus grew concerned about the errors and reported her concerns to Vicky Farres, a CNB auditor.

In response, Ms. Farres conducted a surprise audit of Burlington CNB on May 21, 2014. According to the Bank's Vertex report, the vault should have contained $883,320 in cash on that day. But the audit revealed that the vault held $119,320—$764,000 short.

Ms. Farres reported that Ms. Christy was exceedingly nervous and behaved unusually during the audit. When Ms. Farres started the audit, Ms. Christy delayed the counting process multiple times. Ms. Farres needed to prompt her to begin counting. During the counting, Ms. Farres noticed that Ms. Christy did not replace straps on the stacks of hundred-dollar bills after counting them. Ms. Christy also put the stacks outside Ms. Farres's sight where she could re-count the same stack. At one point, Ms. Christy claimed that $100,000 fell into a crack between the wall and a cabinet. When Ms. Farres and her colleagues examined the crack with a flashlight and a yardstick, they found only dust.

Ms. Farres asked Ms. Christy what had happened to the missing cash. Ms. Christy at first paused and then responded that she had sold it to the FRB. Ms. Farres then asked for the Garda receipts documenting the transactions. Ms. Christy answered that Garda never provided them to her.

---

[3] Ms. Nabus testified that it took Ms. Christy a long time to resolve the problems and that Ms. Christy sometimes did not properly correct the discrepancies on her first try. On occasion, Ms. Nabus needed to tell Ms. Christy multiple times to take remedial action.

The next day, however, Ms. Christy sent Garda receipts to Ms. Gifford for $90,000, $100,000, and $670,000. Ms. Christy stated she had found the receipts in a drawer. Only the $90,000 receipt was reflected in the FRB's records. It was also the only original receipt located during the audit and the ensuing investigation. The other two were copies. Separate from the receipt, the $90,000 cash-out ticket had a "proof strip" showing the sale was made on May 20, 2014, and the $90,000 transaction was recorded on the Vertex report. The Garda receipt for $90,000 bore a legible bag number, which Garda used to track the precise delivery bag that carried the cash.

The documentation of the purported $100,000 and $670,000 sales to the FRB differed from the $90,000 sale. First, in contrast to the $90,000 original receipt, the Bank never found original receipts for the $100,000 and $670,000 transfers. Second, the date stamps for all three receipts matched exactly, showing that the same machine printed all three receipts at the exact same second—May 20, 2014, at 13:35:08. Adam Lewis, the Garda employee who picked up and delivered the money, testified that printing three receipts with precisely the same date stamp would be "completely impossible." ROA, Vol. III at 926. Third, when a transparency of the $90,000 receipt was placed over the copy of the $100,000 receipt, the signatures matched exactly. [4] Fourth, the bag numbers on the two copied receipts were illegible, and surveillance footage showed Mr. Lewis leaving the branch on May 20, 2014, with only one bag. Finally, although the date stamp on the Garda receipts for the purported $100,000 and $670,000 sales was May 20, 2014,

---

[4] Ms. Christy and Mr. Lewis both signed the Garda pick-up receipt.

the Bank's cash-out tickets bore a "proof strip" showing that the tickets were created on May 21, 2014, the day of the audit. *Id.* at 592, 835-36.

### 3. The Government Investigation

The FBI and IRS coordinated the investigation. Two agents from an FBI task force questioned Ms. Christy about the missing money. During the interview, the agents asked Ms. Christy if she would be willing to take a polygraph. Ms. Christy responded that she wanted to think about it. Neither Ms. Christy nor the FBI raised the issue of the polygraph again. Throughout the interview, Ms. Christy denied any wrongdoing.

IRS Special Agent Joseph Schmidt examined Ms. Christy's bank accounts and those of several of her family members. He reviewed Ms. Christy's tax returns (filed jointly with her husband, Chris Christy) from 2008 to 2014. Agent Schmidt found a significant disparity between the bank accounts and the tax returns. The Christys' reported income was about $30,000 to $64,000 per year. Their expenditures, which included cash payments on the Christys' home loans, amounted to $400,000 that was unaccounted for in tax filings. Based on these calculations, Agent Schmidt concluded the Christys had failed to report income on their tax returns.

### B. *Procedural History*

A grand jury indicted Ms. Christy, charging her with one count of bank embezzlement, in violation of 18 U.S.C. § 656 (Count 1); six counts of false bank entries, in violation of 18 U.S.C. § 1005 (Counts 2-7); six counts of declaring false tax returns, in violation of 26 U.S.C. 7206(1) (Counts 8-13); and ten counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(ii) (Counts 14-23). Ms. Christy did not testify

during her six-day trial. The jury convicted her of all counts except four money laundering charges based on loan payments that occurred before 2014.

The district court sentenced Ms. Christy to (1) 51 months in prison for the embezzlement and false bank entries (Counts 1-7), followed by three years of supervised release; (2) 36 months for filing false tax returns (Counts 8-13), followed by one year of supervised release; and (3) 51 months for money laundering (Counts 18-23), followed by three years of supervised release. The court ordered Ms. Christy's sentences to run concurrently. It also ordered $857,708 in restitution. Ms. Christy timely appealed.

We will add factual and procedural background as it becomes relevant.

## II. **DISCUSSION**

Ms. Christy argues that (A) cumulative prosecutorial misconduct violated her due process rights, (B) the evidence was insufficient for her money laundering convictions, and (C) a materiality element was improperly omitted from the false-bank-entry jury instructions.

### A. *Prosecutorial Misconduct*

Ms. Christy asserts that the prosecutor committed 12 acts of prosecutorial misconduct based on comments made during trial. She groups the comments into three "themes," alleging that the prosecutor (1) commented on Ms. Christy's exercising her right to trial, (2) depicted witness Elaine Gifford as credible and sympathetic, and (3) implied witness Raylene Thorne colluded with defense counsel. The following discussion describes the pertinent legal background and standard of review and analyzes the prosecutor's comments. Although we find or assume that some of the comments

9

were improper, we conclude that Ms. Christy has not shown they affected her substantive rights. She must do so to show cumulative error on plain error review, and therefore the comments do not provide a ground to reverse.

1. **Legal Background**

The following describes (1) the relevant prosecutorial misconduct law, (2) the standards of review for appellate challenges to prosecutor statements made at trial, and (3) the cumulative error framework.

   *a. Prosecutorial misconduct*

Prosecutorial misconduct can cause constitutional error in two ways. *Underwood v. Royal*, 894 F.3d 1154, 1167 (10th Cir. 2018). First, it can prejudice a specific constitutional right amounting to a denial of the right. *Id.*[5] Second, "absent infringement of a specific constitutional right, a prosecutor's misconduct may in some instances render a . . . trial 'so fundamentally unfair as to deny [a defendant] due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)); *see United States v. Anaya*, 727 F.3d 1043, 1052-53 (10th Cir. 2013) ("Prosecutorial misconduct violates a defendant's due process if it infects the trial with unfairness and denies the defendant's right to a fair trial." (quotations and alterations omitted)). Ms. Christy argues that the

---

[5] These violations often occur outside of trial, such as during discovery, *see Brady v. Maryland*, 373 U.S. 83 (1963) (failure to deliver exculpatory material); jury selection, *see Batson v. Kentucky*, 476 U.S. 79, 88 (1986) (peremptory strikes based on race); initiation of proceedings, *see Blackledge v. Perry*, 417 U.S. 21, 28 (1974) (prosecutorial vindictiveness); and outside of court proceedings, *see United States v. Cross*, 928 F.2d 1030, 1054 (11th Cir. 1991) (intimidation of witnesses).

cumulative effect of the prosecutor's comments denied her a fair trial.[6]  We therefore

address only the second manner in which prosecutorial misconduct can cause

constitutional error.

The test for whether a defendant's trial was fundamentally unfair based on a

prosecutor's comments proceeds in two steps:  (1) the court first decides whether the

prosecutor's comments were improper, and (2) if so, it examines their likely effect on the

jury's verdict.  *See United States v. Currie*, 911 F.3d 1047, 1055 (10th Cir. 2018); *United

States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011).  The court thus must weigh any

improper comments against the strength of the evidence against the defendant.  *See

Berger v. United States*, 295 U.S. 78, 88-89 (1935) (reversing conviction when

prosecutor's misconduct was "pronounced and persistent" and the evidence against the

defendant was "weak"); *Darden v. Wainwright*, 477 U.S. 168, 179 (1986) (assessing

plainly improper statements in context of entire trial); *United States v. Oberle*, 136 F.3d

1414, 1422 (10th Cir. 1998) (same).

i.  <u>Step one—propriety of the prosecutor's comments</u>

Courts have struggled to determine when a prosecutor's statements are improper.

*See, e.g.*, *Runnels v. Hess*, 653 F.2d 1359, 1362 (10th Cir. 1981) ("The fine line between

what is permissible argument in this area is not always bright.").  They have found that

improper comments at trial include (1) commenting on a defendant's failure to take the

---

[6] As described below, Ms. Christy argues the prosecutor improperly criticized her choice to proceed to trial, but she does not argue that these comments denied her right to trial.

11

stand, *see Griffin v. California*, 380 U.S. 609, 611-12 (1965); (2) referring to matters not in evidence, *see United States v. Ainesworth*, 716 F.2d 769, 771 (10th Cir. 1983); (3) encouraging the jury to allow victim sympathy to influence its decision, *see Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999); (4) "vouching" for the credibility of a government witness or giving personal views on the case, *see United States v. Swafford*, 766 F.2d 426, 428 (10th Cir. 1985); (5) distorting the record by misstating the evidence, *see Le v. Mullin*, 311 F.3d 1002, 1020 (10th Cir. 2002); (6) misstating the law, *see Currie*, 911 F.3d at 1057; (7) making derisive comments about opposing counsel in front of the jury, *see United States v. Young*, 470 U.S. 1, 9 (1985); and (8) appealing to the jury's passion and prejudice or implying a jury has a civic duty to convict, *see Thornburg v. Mullin*, 422 F.3d 1113, 1133-34 (10th Cir. 2005); *see also* Paul J. Spiegelman, *Prosecutorial Misconduct in Closing Argument:  The Role of Intent in Appellate Review*, 1 J. App. Prac. & Process 115, 134-36 (1999) (listing examples).

Any alleged improper comments must be examined in context.  *Young*, 470 U.S. at 11.  For example, when a prosecutor has responded to a defense counsel's arguments, courts grant more leeway.  *See United States v. Robinson*, 485 U.S. 25, 31 (1988); *United States v. Ivory*, 532 F.3d 1095, 1100 (10th Cir. 2008).  In *United States v. Jackson*, the prosecutor suggested the defendant should "man up" and "accept responsibility" for his actions.  736 F.3d 953, 957 (10th Cir. 2013).  We held that these statements did not constitute prosecutorial misconduct because they were made in response to defense counsel's suggestion that others might be at fault for a car accident that occurred as the defendant was fleeing the scene of a bank robbery he had committed.  *Id.*

12

Courts may consult codes of professional responsibility in assessing a prosecutor's statements. *Young*, 470 U.S. at 7-9 (citing American Bar Association codes of professional conduct); *see Malicoat v. Mullin*, 426 F.3d 1241, 1257 (10th Cir. 2005) (same). They also may consider the prosecutor's intent. *See Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955) (assessing propriety of comments based on their "manifest[] inten[t]"); *see also Oregon v. Kennedy*, 456 U.S. 667, 675-76 (1982) (examining prosecutor's intent in double jeopardy context to assess whether statements "goad[ed]" defendant to move for a mistrial); *United States v. Tafoya*, 557 F.3d 1121, 1126 (10th Cir. 2009) (same). But courts "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning." *Donnelly*, 416 U.S. at 647.

Notwithstanding these guideposts, "[t]he line separating acceptable from improper advocacy is not easily drawn." *Young*, 470 U.S. at 7. This difficulty has prompted some courts to assume the comments were improper and then decide whether they prejudiced the jury's verdict. *See Fleming*, 667 F.3d at 1106 ("We need not decide whether the prosecutor's comment . . . was improper, because even if it were, [the defendant] has not demonstrated that the statement violated his substantial rights."). This approach relies on step two to resolve the issue, which we turn to next.

ii. <u>Step two—effect on jury's verdict</u>

When a court determines or assumes the prosecutor made an improper comment, it then assesses whether the comment affected the jury's verdict. *See id.*[7] The applicable standard of review, which we discuss below, determines which party bears the burden of showing whether the defendant suffered prejudice. *See Anaya*, 727 F.3d at 1052-53. Absent prejudice, a prosecutor's improper statements alone will not require a new trial. *United States v. Sorensen*, 801 F.3d 1217, 1242-43 (10th Cir. 2015).

To make the prejudice determination, courts "consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996) (quotations omitted); *see also United States v. Taylor*, 514 F.3d 1092, 1096-97 (10th Cir. 2008) (finding no prejudice when district court "rapidly" issued curative instruction). We presume that juries follow the district court's curative instructions unless there is reason to believe otherwise. *United States v. Erickson*, 561 F.3d 1150, 1169 (10th Cir. 2009).

The prevalence and degree of improper statements in a trial can affect the prejudice analysis. *See Berger*, 295 U.S. at 89; *Gabaldon*, 91 F.3d at 94 (declaring "prosecutorial misconduct may be so egregious as to warrant reversal"). But "[t]he

_____

[7] At trial, the district court may sua sponte determine that a prosecutor's comment was improper and prejudicial, *see Anaya*, 727 F.3d at 1052, but more often it will be asked to assess prejudice on a motion for a mistrial or a new trial, *see United States v. Gabaldon*, 91 F.3d 91, 93 n.1 (10th Cir. 1996).

ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Wilson v. Sirmons*, 536 F.3d 1064, 1117 (10th Cir. 2008) (quotations omitted); *see Currie*, 911 F.3d at 1160 (affirming conviction in spite of prosecutor's misstatements of law when there was "overwhelming" evidence of defendant's guilt).[8]

b. *Standards of review*

When a defendant seeks appellate relief for improper prosecutor comments made at trial, the standard of review that we apply to the foregoing two-step test depends on whether the defendant objected at trial and how the court responded. *Anaya*, 727 F.3d at 1052-53. In *Anaya*, we identified the standard of review for four situations:

(1) The defendant objects and the court overrules the objection—de novo review.

(2) The defendant objects, the district court takes curative action, and the defendant objects to the adequacy of the curative action or asks for a mistrial—abuse of discretion review.

(3) The defendant objects, the district court sustains the objection, and the defendant fails to object to the adequacy of the curative action—plain error review.

(4) The defendant does not object at trial but raises the issue on appeal—plain error review.

*Id.*

---

[8] As with step one in assessing prosecutorial misconduct, courts have struggled with step two. This court, for example, once declared itself "in equipoise as to how the jury must have necessarily taken [the prosecutor's] statement." *United States v. Rahseparian*, 231 F.3d 1267, 1274 (10th Cir. 2000).

Under de novo review, we "first decide whether the conduct was improper and then, if so, whether the *Government* has demonstrated that error was harmless beyond a reasonable doubt." *Id.* at 1052 (quotations omitted) (emphasis added). Under plain error review, "reversal is warranted only when [1] the prosecutor's statement is *plainly improper* and (2) the *defendant* demonstrates that the improper statement affected his or her substantial rights." *Id.* at 1053 (quoting *Fleming*, 667 F.3d at 1103) (emphasis added). To be plain, an error must be "clear" or "obvious," meaning it is contrary to well-settled law. *Taylor*, 514 F.3d at 1100.

c. *Cumulative error*

Ms. Christy's aggregate effect challenge implicates this circuit's law on the proper approach to cumulative error review. We consider cumulative error only if the appellant has shown at least two errors that were harmless. *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc). Anything less would leave nothing to cumulate. *See id.* The question is whether the two or more harmless errors together constitute prejudicial error. *See id.* at 1469-70. As applied to the prosecutor comment context, a court may proceed with a cumulative error analysis only when the appellant has shown at least two comments were improper but were not prejudicial on their own. The court would then determine whether the comments together were prejudicial.

But before a court can make that determination, it must distinguish between alleged errors that were preserved for appeal and those that were not. As for at least two preserved errors, we consider whether the government can show they together were harmless beyond a reasonable doubt. *See United States v. Rogers*, 556 F.3d 1130, 1141,

16

1144 (10th Cir. 2009). If the government cannot make that showing, we reverse. But if it can, we next combine the preserved errors and the unpreserved errors and decide, under plain error review, whether the defendant can show they together influenced the jury's verdict. *Id.* at 1144. If the defendant cannot, we affirm.

*   *   *   *

With these principles in mind, we address the propriety of each of the prosecutor's comments, grouping them under Ms. Christy's three "themes" of alleged misconduct. We then analyze whether Ms. Christy has shown whether the comments we have determined or assumed to be improper cumulatively "infect[ed] the trial with unfairness" and denied her the right to a fair trial. *Anaya*, 727 F.3d at 1052. Although we determine or assume that some of the prosecutor's comments were improper, when judged in light of the entire trial record, we conclude these comments cumulatively did not outweigh the overwhelming evidence of Ms. Christy's guilt and did not influence the jury's verdict.

2. **Analysis**

a. *Cumulative error: analytical framework*

Ms. Christy argues that the cumulative effect of the prosecutor's 12 comments violated her due process right to a fair trial. She contends that each comment was improper, but she does not claim that any one comment, standing alone, was enough to reverse her conviction. It follows that, even if improper, each comment alone would have been non-prejudicial and not reversible error. Rather than seek reversal based on any single comment, Ms. Christy argues that the comments together created a

17

"crescendoing" or "cumulative" effect that infected the trial as a whole. Aplt. Br. at 17, 20.

To enable us to do the cumulative error analysis, we must first determine whether any of the alleged wrongful comments was improper. And to do this, we must use the proper standard of review, which we outlined for different circumstances in *Anaya* and summarized above. This exercise consumes the majority of our analysis below. We address each of the prosecutor's comments not only to assess which ones may have been improper but also to aid our later analysis in which we weigh impropriety against the strength of the prosecution's case. *See Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *United States v. Darden*, 688 F.3d 382, 397 (8th Cir. 2012) (balancing "strength of the evidence against the cumulative effect of prosecutorial misconduct").

We proceed as follows. First, we examine each of the 12 statements under the proper standard of review to determine which ones were improper. Only improper comments qualify for the cumulative error analysis. Second, we determine whether the improper comments preserved for appellate review together caused cumulative harmful error. Third, assuming the preserved comments were not cumulatively harmful, we add in the unpreserved improper comments to determine whether Ms. Christy has shown the preserved and unpreserved wrongful comments influenced the jury's verdict.

b. *Propriety of the prosecutor's comments*

For each of Ms. Christy's three categories of alleged improper comments, we provide a chart that lists each comment, whether Ms. Christy objected to the comment at trial, the court's response to each objection, and the applicable standard of review.

18

i. Comments on Ms. Christy's exercising her rights

Ms. Christy alleges that the prosecutor improperly commented on her decision to exercise her constitutional rights in the following five instances:

| Government Comments on Ms. Christy Exercising her Rights | | |
|---|---|---|
| **Statement** | **Objection/ Result** | **Standard of Review** |
| **Comment 1**<br><br>**Opening:**<br><br>So at the end of this case and the presentation of evidence, we're going to ask you to do something that she is unwilling to do and that is to make her accountable for her criminal conduct. She wants to get away with this scot-free . . . .<br><br>ROA, Vol. III at 248. | No | Plain error |
| **Comment 2**<br><br>**Closing (Rebuttal):**<br><br>So she was offered an opportunity to make an explanation. She was offered an opportunity to take a polygraph. She didn't avail herself of ever attempting to contact a representative of the United States after that.<br><br>ROA, Vol. III at 1089. | No | Plain error |
| **Comment 3**<br><br>**Closing (Rebuttal):**<br><br>The evidence in its entirety should lead you to the conclusion that she should be held accountable for conduct which she is unwilling to accept.<br><br>ROA, Vol. III at 1089. | No | Plain error |
| **Comment 4**<br><br>**Closing (Rebuttal):** | | De novo |

19

| | | |
|---|---|---|
| I enjoy where we have a case where someone has confessed to the offense. It's—it's an acknowledgment of their wrongdoing. But short of that, when somebody is denying it, I would prefer a ridiculous story. And that's what we've heard in argument and in cross-examination of our witnesses.<br><br>ROA, Vol. III at 1089-90. | Yes/<br>Overruled | |
| **Comment 5**<br><br>**Closing (Rebuttal):**<br><br>So I believe when you review all the evidence, you will find that there is evidence beyond a reasonable doubt to hold the defendant accountable for each and every count of the indictment, to return a verdict of that, and to make her accept responsibility for that verdict even though she won't do it voluntarily. Thank you, folks.<br><br>ROA, Vol. III at 1090. | No | Plain error |

We review Comments 1, 2, 3 and 5 for plain error to determine whether they were "plainly improper." We review Comment 4 de novo to determine whether it was improper.

### 1) Additional legal background

The Sixth Amendment provides that "the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Together they guarantee the defendant's right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 684-85 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment."). The Fifth Amendment

"forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin*, 380 U.S. at 615. We have "distinguished between prosecutorial statements implying guilt or challenging credibility," which are not improper, from "those relating to an accused's failure to testify," which are. *Runnels*, 653 F.2d at 1362. The prosecution is "free to comment on a defendant's failure to call certain witnesses or present certain testimony." *Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001).

We assess whether a comment references a defendant's failure to testify by asking "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Knowles*, 224 F.2d at 170; *see United States v. Rahseparian*, 231 F.3d 1267, 1273-74 (10th Cir. 2000) (surveying case-law). Some courts have extended *Griffin*'s holding to certain enumerated rights. *See, e.g.*, *Marshall v. Hendricks*, 307 F.3d 36, 71 (3d Cir. 2002) (extending *Griffin* to the right to counsel and the right to call witnesses).

### 2) Analysis

Ms. Christy argues that these five statements were improper because they criticized her for exercising her constitutional rights. Her brief invokes the Fifth Amendment and *Griffin*'s prohibition on comment about the defendant's silence, and it cites the Sixth Amendment regarding the defendant's right to a trial. Aplt. Br. at 21.[9]

---

[9] Ms. Christy does not cite any cases in which this circuit has held that a comment on a defendant's decision to proceed to trial violated the due process right to a fair trial. *See* Aplt. Br. at 21. She discusses one recent decision from the Oklahoma Court of

21

Comment 2 about the offer to take a polygraph was not about Ms. Christy's failure to testify at trial or her exercise of the right to trial. It was made in response to the following part of Ms. Christy's counsel's closing argument: "Remember [Ms. Christy's] interview? And [the FBI agents] said, oh, we'll get a polygraph. Why don't you take a polygraph? That will sort all of this out. They didn't do that. They didn't ever come back and talk to her again. They didn't reach out to her attorneys." ROA, Vol. III at 1077. In suggesting that the agents' investigation was incomplete, Ms. Christy's counsel invited the prosecution to explain the lack of follow up. To "right the scale," the prosecutor responded that Ms. Christy herself could have invited a second interview. *See Young*, 470 U.S. at 12-13. Though questionably relevant, the prosecutor's comment was made in response to defense counsel's criticism in closing argument of the agents' investigation and was not "plainly improper" under plain error review.

The prosecutor's other four statements—Comments 1, 3, 4, and 5—did not comment about Ms. Christy's failure to testify. They also did not expressly comment on Ms. Christy's exercising her right to a trial. These statements, broadly interpreted, could be understood as an implied comment on Ms. Christy's decision to go to trial rather than plead guilty, though none of them stated this specifically.

---

Criminal Appeals that stated, "The prosecutor's commentary on Appellant's decision to exercise his right to trial, rather than plead guilty, is nothing short of alarming." *Barnes v. State*, 408 P.3d 209, 214 (Okla. 2017). The Government does not contest that criticizing Ms. Christy's decision to go to trial would have been improper, but it argues the prosecutor did not do so here. Aplee. Br. at 25-26.

We review Comments 1, 3, and 5 to consider whether they were "plainly improper." Comment 1, the prosecutor's opening statement about Ms. Christy's unwillingness to be accountable, could be read to state the obvious—that she had not pled guilty. But it also could be taken as criticism of her decision to put the government to its burden of proving her guilty, which was her right under the Fifth and Sixth Amendments. *See generally Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (explaining Fifth Amendment "requirement of proof beyond a reasonable doubt" and Sixth Amendment "right to a speedy and public trial, by an impartial jury"). The same can be said about Comments 3 and 5, both made in rebuttal closing argument. As noted above, the defense failed to object to these comments, and the question under plain error review is whether they were "plainly improper," *Anaya*, 727 F.3d at 1053.

Unlike a comment on a defendant's failure to testify, which suggests the defendant lacks a truthful defense, *see Griffin*, 380 U.S. at 614-15, a comment that the defendant has chosen to go trial and contest the charges rather than plead guilty carries no such connotation. The prosecutor's comments were not made, as they were in our *Jackson* case, in direct response to an argument from defense counsel, but they did respond to the defendant having pled not guilty. 736 F.3d at 957. We need not decide whether these statements were "plainly improper" because, as we discuss below, even if they were, Ms. Christy has not shown that they influenced the jury in light of the compelling evidence against her. *See Fleming*, 667 F.3d at 1104.

As for Comment 4, which we review de novo for its propriety, the prosecutor's statement that he enjoys when someone has confessed was not relevant but not improper.

23

His statement that he prefers a "ridiculous story" when someone has denied guilt seems to be a fair advocacy comment on the defendant's evidence. The comment as a whole, like the other comments, do not expressly criticize Ms. Christy for going to trial, but even if Comment 4 could be read as implying so, it would not be enough, along with other comments in the cumulative error analysis below, to show prejudice.

ii. Comments depicting Elaine Gifford as credible and sympathetic

As noted above, Ms. Gifford was Ms. Christy's supervisor at the Bank. She was terminated after the Bank discovered Ms. Christy's embezzlement. Ms. Christy argues that the prosecutor improperly depicted Ms. Gifford as credible and sympathetic in the following five instances:

| Government Comments Depicting Ms. Gifford as Credible and Sympathetic | | |
|---|---|---|
| **Statement** | **Objection/ Result** | **Standard of Review** |
| **Comment 6**<br><br>**Opening:**<br>And it is now time to become serious because it's a very serious matter. It's serious to the victims of the crime. The main victim is Central National Bank, but there was a lot of collateral damage caused by the defendant, Denise Sue Christy, over there . . . Elaine Gifford is one of the collateral damage [sic] caused by the defendant, Denise Sue Christy.<br><br>ROA, Vol. III at 235, 238. | No | Plain error |
| **Comment 7**<br><br>**Direct Examination of Ms. Gifford:** | No | Plain error |

24

| | | |
|---|---|---|
| **Ms. Gifford**: Correct. I relied on Denise. I trusted her. And I trusted all my girls down there to do the right thing. You know, you put them in charge of something, you relied on them to do the correct—you know, we're like family, you know. We were just a group that enjoyed each other and thought we all would do what was right.<br><br>**AUSA**: Found out that wasn't correct?<br><br>**Ms. Gifford**: Correct.<br><br>**AUSA**: It's okay. You—you lost your job over this, didn't you?<br><br>**Ms. Gifford**: I did. And I'm paying for it.<br><br>ROA, Vol. III at 706-07. | | |
| **Comment 8**<br><br>**Direct Examination of Ms. Gifford:**<br><br>**Ms. Gifford**: I relied on Denise to balance the vault every day to make sure, you know, it balanced. Between her and Raylene. You know, when—when you—when you work for someone—with someone for 15 years, you know, you're kind of family and you trust them and they should, you know—<br><br>**Defense Counsel**: Objection, Judge. I'm sorry, it's nonresponsive.<br><br>**The Court**: Yeah, I think it's—I think we wandered into an area. Why don't you put a question to the witness.<br><br>**AUSA**: So you're telling us, I think, that you were relying upon her faith and honesty?<br><br>**Ms. Gifford**: Yes.<br><br>**AUSA**: And did you find out after May the 21st of 2014, the date of the surprise examination, that she had betrayed your faith—<br><br>**Defense Counsel**: Objection. Improper opinion.<br><br>**The Court**: Overruled.<br><br>**Defense Counsel**: Objection. Leading.<br><br>**The Court**: Overruled. | Yes/<br>Overruled | De novo |

| ROA, Vol. III at 780-81. | | |
|---|---|---|
| **Comment 9**<br><br>**Closing:**<br><br>**AUSA:** And finally, I want to single out Elaine Gifford. She may have come across kind of short with you, but she was one of the collateral damage [sic] I mentioned in opening statement. This defendant, cunning and malevolent as she is, is willing to throw anybody under the bus if she can get away with her crime.<br><br>ROA, Vol. III at 1042. | No | Plain error |
| **Comment 10**<br><br>**Closing:**<br><br>**AUSA:** And what she said was what I told you in opening statement. That with all the rules and regulations and so forth that the bank has in place to try to make sure these things don't happen, it boils down fundamentally to the honesty of the people executing those procedures. Elaine Gifford said they were like family there. And she was probably the most sincere witness I've ever seen—<br><br>**Defense Counsel**: Objection. Vouching.<br><br>**The Court**: Sustained.<br><br>**AUSA**: She broke down on the stand and she told you the truth. She relied upon the honesty and integrity of her employees, and they did not come up to her standards.<br><br>ROA, Vol. III at 1042-43. | Yes/ Sustained<br><br>No curative measures taken or requested | Plain error |

We review Comment 8 de novo and review Comments 6, 7, 9, and 10 for plain error.

### iii. Additional legal background

Courts frown on attorneys commenting on the sincerity and truthfulness of a witness. *Swafford*, 766 F.2d at 428. As we stated in *Swafford*, "We continue to hold that

26

vouching by an attorney as to the veracity of a witness is improper conduct and an error which this court will carefully review." *Id.* Although "some emotional influence is inevitable" in victim testimony, *Wilson*, 536 F.3d at 1120, "[t]his court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision," *Moore*, 195 F.3d at1172 (finding comments eliciting sympathy were improper but holding that they did not influence the verdict).

### iv. Analysis

The parties agree that Comment 10—the prosecutor's statement that Ms. Gifford was "probably the most sincere witness the prosecutor had ever seen"—was improper vouching. *See* Aplee. Br. at 30 (conceding that Comment 10 was improper). We agree, too. Prosecutors may not personally vouch for the credibility or truthfulness of a witness. *Swafford*, 766 F.2d at 428. In this instance, the prosecutor made the vouching statement in his rebuttal closing argument. The district court sustained the defendant's objection. It did not give a curative instruction, and the defense did not ask for one.

The other comments are less concerning. Not only did the defense fail to object to Comments 6, 7, and 9, it also did not object to Ms. Gifford's testimony that she was fired because of Ms. Christy's embezzlement. Ms. Gifford's testimony informed the jury about the Bank's management structure, her supervisory responsibilities, her deficient supervision of Ms. Christy, and the consequences of Ms. Christy's embezzlement. The prosecutor's comments in opening statement, direct examination, and closing argument were consistent with the prosecution's task of providing a narrative of what happened. The Supreme Court has recognized "the offering party's need for evidentiary richness

and narrative integrity in presenting a case," "not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Old Chief v. United States*, 519 U.S. 172, 183, 187 (1997); *see United States v. Silva*, 889 F.3d 704, 713 (10th Cir. 2018).

As to Comment 8, we agree with the district court's overruling of the defense's objection. The prosecutor's questions about Ms. Gifford's trust or faith in Ms. Christy were relevant to the circumstances surrounding the embezzlement and were not improper.

We must weigh, however, the prosecutor's plainly improper vouching statement— Comment 10—against the weight of the evidence to determine whether Ms. Christy has shown that this comment, along with the prosecutor's other comment we assume to be improper, prejudiced the jury. As we discuss below, Ms. Christy has not met her burden.

c. *Comments suggesting Raylene Thorne colluded with defense counsel*

As noted above, Ms. Thorne was Ms. Christy's sister-in-law and co-worker at the Bank. Ms. Christy argues that the prosecutor improperly suggested that Ms. Thorne colluded with defense counsel in the following two instances:

| Government Comments Implying Ms. Thorne Colluded with Defense Counsel | | |
|---|---|---|
| **Statement** | **Objection/ Result** | **Standard of Review** |
| **Comment 11** <br><br> **Redirect Examination of Ms. Thorne:** <br> **AUSA**: Did you meet with [defense counsel] prior to your testimony today? | Yes/ Sustained | Plain error |

| | | |
|---|---|---|
| **Ms. Thorne**: Who? | | |
| **AUSA**: The gentleman here, Mitch? | | |
| **Ms. Thorne**: Did I talk to him? | | |
| **AUSA**: Yes. | | |
| **Ms. Thorne**: Yes, I have talked to him. | | |
| **AUSA**: Okay. | | |
| **Ms. Thorne**: Yes. | | |
| **AUSA**: In preparation for your testimony? | | |
| **Ms. Thorne**: He's gone over the same things that you have gone over. | | |
| **AUSA**: Okay. | | |
| **Ms. Thorne**: Yes. He asked me why I would have signed certain tickets. | | |
| **AUSA**: You have to answer my questions, okay? | | |
| **Ms. Thorne**: Okay. | | |
| **AUSA**: When you met with him, how many occasions was it? | | |
| **Ms. Thorne**: Actually to sit down and talk to him, probably two. | | |
| **AUSA**: For how long? | | |
| **Ms. Thorne**: I would say anywhere from 30 minutes to maybe an hour. | | |
| **AUSA:** Because you seem to be kind of rehearsed, your questions— | | |
| **Defense Counsel:** Objection, Judge. | | |
| **The Court**: Sustained. It's argumentative. | | |
| ROA, Vol. III at 892-93. | | |
| **Comment 12**<br><br>**Closing (Rebuttal):**<br><br>**AUSA:** [1] We called Raylene [Thorne] to the stand because she told us during the interview what we'd present as far as evidence was concerned. Raylene Thorne, I remind you, is the sister-in-law of the defendant. She | [1] No | Plain Error |

| | | |
|---|---|---|
| confirmed what Elaine told you was the practice in respect to filling out the Vertex reports. And that was both she, Elaine, and Raylene relied upon calculator tapes that were presented to her by the defendant, Denise Christy. That's what they relied on. This audit was supposedly done, Elaine is sitting at a desk. She's not even looking into this. And Elaine is simply putting down in the audit report what Denise Christy is telling her are the denominations in that vault. [2] Now, she did have some interesting testimony on cross examination, which we had never heard before, and that was that she counted the vault. Never told us that during the interview. I would have presented that as evidence because that's my job, to provide any exculpatory information I'm aware of. [3] And it was clear that she had been prepared by the defense for rapid-fire responses. Question. Boom. Question. Boom. Question. Boom. I didn't know that she had met with the defense. But she had. For hours. But, you know, when you have that kind of rapid-fire questioning and response, you make mistakes kind of like you do when you're fabricating documents— | [2] No<br><br>[3] Yes/ Overruled | Plain error<br><br>De novo |
| **Defense Counsel**: Objection. Impugning the defense.<br><br>**The Court**: I didn't hear the objection.<br><br>**Defense Counsel**: Impugning the defense, Judge.<br><br>**The Court**: Let me talk to you. Sidebar, please.<br><br>**Defense Counsel**: Judge, the argument is that the defense has somehow concocted some kind of defense by coordinating the witnesses and doing this—some kind of rapid-fire question and response. That impugns upon defense counsel, that they have done something wrong. That's an improper argument.<br><br>**The Court**: Mr. Hathaway.<br><br>**AUSA**: That's not an improper argument if they're being—being prepared. And I'm just going to go into the next phase of it, which is that she testified to something that was false and that is that she testified she counted the vault on two occasions when her sister-in-law was on vacation. It turns out that Raylene was on vacation with her sister-in-law. | | |

| | | |
|---|---|---|
| **Defense Counsel**: Judge, I'm not objecting to whether or not the prosecutor wants to present evidence. I'm objecting to the manner in which he did this and to impugning the defense. Is [sic] improper argument.<br><br>**AUSA**: They impugned the government at every turn.<br><br>**The Court:** I'm going to overrule the objection. I do think there has been an attack on the investigation. I think this is fair comment. I think fabrication—calling it fabricating is a verb that concerns me some.<br><br>**AUSA**: Well, I was referring to the documentation that were the tickets, that she fabricated those.<br><br>**The Court**: I don't think that's—my concern is that's not what you said. I'm overruling the objection. But I do—I do request that you steer clear of fabrication by counsel because I don't think that is what you intend to say and I think it's close to what you're saying.<br><br>ROA, Vol. III at 1083-86. | | |

We review Comment 11 for plain error. Comment 12 has three parts—(1) a reminder that Ms. Thorne was Ms. Christy's sister-in-law and of Ms. Thorne's role in preparing the audit report, (2) a statement that the prosecutor heard for the first time on cross-examination that Ms. Thorne "counted the vault" and how the prosecutor would have disclosed that information had he known about it earlier, and (3) a statement about the defense's preparation of Ms. Thorne for her testimony. Defense counsel objected only to the third part, and his objection was overruled. So we apply plain error review to determine whether the first two parts of Comment 12 were plainly improper statements and de novo review to decide whether the third was improper.

i. Additional legal background

"Attacks on defense counsel can at times constitute prosecutorial misconduct." *Wilson*, 536 F.3d at 1119. In a criminal trial, "[t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." *Id.* (quoting *United States v. Bennett*, 75 F.3d 40, 46 (1st Cir. 1996)). On the other hand, "it is not improper for a prosecutor to direct the jury's attention to evidence that tends to enhance or diminish a witness's credibility." *Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005).

ii. Analysis

In its redirect examination of Ms. Thorne, which included Comment 11, the prosecution inquired about her meeting with defense counsel to go over her testimony. The questioning was mostly unobjectionable, commonplace impeachment. Toward the end, however, rather than ask a question, the prosecutor said, "Because you seem to be kind of rehearsed, your questions—." ROA, Vol. III at 893.

In asking Ms. Thorne about her meetings with defense counsel, the prosecutor may instead have inquired whether they rehearsed her testimony. But the prosecutor chose to express his own opinion that the in-court testimony "seem[ed] . . . rehearsed." *Id.* The court, correctly in our view, sustained the defense's objection, explaining that the prosecutor's statement was "argumentative." *Id.* Defense counsel did not seek a curative instruction, and the court did not give one.

Although the prosecutor's statement was objectionable, whether it was "plainly improper" in the context here need not be determined. Because even if it were, Ms.

32

Christy has not shown, as we discuss below, that the cumulative effect of the prosecutor's challenged statements influenced the jury verdict in the face of the incriminating evidence presented against her.

Comment 12 in the Government's rebuttal closing argument was more benign. First, the statement properly recounted that Ms. Thorne is Ms. Christy's sister-in-law and Ms. Thorne's role in preparing the audit report. *See Thornburg*, 422 F.3d at 1132. Second, the prosecutor's comment about Ms. Thorne's testimony on cross-examination "that she counted the vault" as something she had not previously told the government, and that he would have disclosed it if she had, seems to stray from the record. ROA, Vol. III at 1084. The first statement was not plainly improper, and we doubt the second one was either, but even if we assume it was and include it in the cumulative error analysis, we later conclude there was no cumulative error.

The prosecutor's third statement in Comment 12 was that "[Ms. Thorne] had been prepared by the defense for rapid-fire responses" and that "you make mistakes kind of like you do when you're fabricating documents." ROA, Vol III at 1084. Defense counsel objected that this was "[i]mpugning the defense." *Id.* The court overruled the objection, though it said the word "fabricating" "concerns me some." *Id.* at 1086. The prosecutor said he was referring to the "tickets[] that she fabricated." *Id.* The court told him to "steer clear of fabrication by counsel because I don't think that is what you intend to say and I think it's close to what you're saying." *Id.* We agree that the prosecutor came close to the line, but again, even if improper, the statement was not enough, along

33

with the other statements considered for their cumulative error, to overcome the evidence supporting Ms. Christy's convictions.

\* \* \* \*

To recap our step one review, Comments 2, 6, 7, 9, and the first part of Comment 12 were not plainly improper.[10] Comment 8 was not improper. Comments 1, 3, 4, and 5 may have impliedly criticized Ms. Christy's choice to go to trial; Comment 11 stated rather than asked whether Ms. Thorne's testimony had been rehearsed; the second part of Comment 12 about Ms. Thorne's cross-examination included off-record comment; and the third part of Comment 12 about defense counsel's preparation of Ms. Thorne to testify was, as the district court said, at least borderline improper. As to these comments, we do not need to decide whether 1, 3, 5, 11, and the second part of 12 were plainly improper under plain error review or whether 4 and the third part of 12 were improper under de novo review. We will assume that they were, but when combined with Comment 10, which was plainly improper, they did not, as the ensuing analysis shows, influence the jury's verdict.

As we turn to the cumulative error analysis, the following chart summarizes where we are after our step one discussion. Only the comments with check marks in the last three columns qualify for cumulative error review.

---

[10] Comment 2 was dubiously relevant and likely excludable had there been an objection, but it was not plainly improper.

34

| Comment | Not Improper | Not Plainly Improper | Assume Improper | Assume Plainly Improper | Plainly Improper |
|---|---|---|---|---|---|
| 1 | | | | ✓ | |
| 2 | | ✓ | | | |
| 3 | | | | ✓ | |
| 4 | | | ✓ | | |
| 5 | | | | ✓ | |
| 6 | | ✓ | | | |
| 7 | | ✓ | | | |
| 8 | ✓ | | | | |
| 9 | | ✓ | | | |
| 10 | | | | | ✓ |
| 11 | | | | ✓ | |
| 12[1] | | ✓ | | | |
| 12[2] | | | | ✓ | |
| 12[3] | | | ✓ | | |

3. **Cumulative Effect of Improper Comments on Ms. Christy's Substantial Rights**

Under our cumulative error analysis, we first examine the preserved errors and determine their effect on the jury's verdict. *Rogers*, 556 F.3d at 1144. As discussed above, the district court overruled Ms. Christy's objections to Comments 4, 8, and the third part of 12, and we therefore have reviewed each of those comments de novo. *Anaya*, 727 F.3d at 1052. We found that Comment 8 was not improper but assumed that Comments 4 and the third part of 12 were improper. Ms. Christy does not argue that

35

these preserved errors affected the verdict. Aplt. Br. at 19-20. But even if she had, for the reasons stated below as to all the comments that qualify for cumulative error review, the Government could show beyond a reasonable doubt that the trial was not "so fundamentally unfair as to deny [her] due process," *Donnelly*, 416 U.S. at 645; *see Rivera*, 900 F.2d at 1470 n.6.

Accordingly, we move to the second step of cumulative error analysis and consider whether the effect of the preserved-error comments, together "with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error." *Rogers*, 556 F.3d at 1144 (quotations omitted). As to Comment 10 and the comments we assume were improper or plainly improper, Ms. Christy still must show that they cumulatively influenced the jury's verdict. *See Fleming*, 667 F.3d at 1104; *Anaya*, 727 F.3d at 1053. We conclude that she has not done so.

First, and most important, the inculpatory evidence against Ms. Christy was overwhelming. The Government proved that Ms. Christy had deposited more than $400,000 in her personal accounts over a six-year period and that she failed to report the deposits on her tax returns from 2008 through 2014.[11] Ms. Christy argues her deposits "did not add up to anywhere near [the missing] [$764,000]." Aplt. Br. at 38. But she offers no explanation for the dramatic difference between her sizeable cash deposits and her reported income.

---

[11] The indictment did not charge Ms. Christy for filing a false 2014 return, though there was evidence that she failed to report income for that year as well.

The jury also heard testimony from Ms. Farres about Ms. Christy's nervousness during the audit and her suspicious conduct in the vault. For example, she caught Ms. Christy trying to recount stacks of hundred-dollar bills and investigated Ms. Christy's bluff that $100,000 had fallen into a crack near the vault. Moreover, the jury heard Ms. Gifford explain that the day after the audit, Ms. Christy "found" two deposit receipts showing that she had transferred the missing cash to the FRB. *See* ROA, Vol. III at 698-703. But the "receipts" (1) were copies, (2) bore the exact same signatures and time stamps as another original receipt, (3) did not contain a legible bag number, and (4) corresponded to cash-out tickets bearing unalterable "proof strips" declaring they were printed on May 21, 2014, the day of the audit. In short, the evidence showed that the receipts had been fabricated—copied from an original receipt and reflecting false deposits. The false deposits were just two in a string of fraudulent "sales" that Ms. Christy made (and which Ms. Nabus caught and flagged).

In addition, both Ms. Gifford's and Ms. Thorne's testimony established that Ms. Christy was responsible for the daily operations of the vault. Although Ms. Gifford was the branch manager and Ms. Thorne was nominally the vault teller, Ms. Christy conducted routine audits and sent money to the FRB on a biweekly basis, providing her the opportunity to prepare false bank entries and embezzle the cash. Moreover, to the extent the defense tried to pin blame on Ms. Thorne and Ms. Gifford, the jury had a full opportunity to judge their credibility. In short, the evidence was more than sufficient for

the jury to convict Ms. Christy of embezzling the Bank's money, submitting false entries to the bank, and falsely reporting her income on her tax filings.[12]

Second, the district court instructed the jurors to disregard the prosecutor's comments. It told the jurors that (1) it is their duty to follow and apply the law as provided to them by the district court (Instruction 1); (2) they are the judges of the facts (Preliminary Instructions); (3) statements and arguments of lawyers are not evidence (Preliminary Instructions and Instruction 7); (4) the government has the burden of proving the defendant guilty beyond a reasonable doubt (Instruction 4); and (5) the defendant had no burden to prove her innocence or produce any evidence at all (Instruction 8). Absent evidence to the contrary, the jury is presumed to have followed those instructions. *Erickson*, 561 F.3d at 1169.

Of the 12 comments that Ms. Christy challenges, the prosecutor made one of them in his opening statement and eight in closing argument. The jury heard the preliminary instructions immediately before opening statements and heard the remaining instructions immediately before closing arguments. Thus, when the prosecutor made the allegedly inappropriate comments, the court's instructions were fresh in the jurors' minds. Ms. Christy has given us no reason to doubt that they followed those instructions.

---

[12] Please note this analysis applies to Ms. Christy's convictions for embezzlement, false bank entries, and false tax reports. It does not apply to her money laundering convictions. Because we reverse those convictions in the next section of this opinion based on insufficiency of the evidence, we consider the prosecutorial misconduct issue only in relation to the remaining convictions.

Third, although not dispositive, the jury acquitted Ms. Christy of four money laundering charges, which undercuts an argument that the jury could not follow instructions or "fairly judge the evidence." *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006). Instead, it shows that the jury was paying attention, weighed the facts, and found that some of the charges were not sufficiently proven.

Fourth, the six-day trial produced approximately 1,000 pages of transcribed testimony from 14 witnesses. Although not "isolated," the prosecutor's comments represented a small portion of what was presented to the jury. *See Donnelly*, 416 U.S. at 647.

In sum, though we do not condone several of the prosecutor's comments, Ms. Christy has not shown they collectively affected her substantial rights. We deny her request to reverse her convictions based on prosecutorial misconduct.

## B. *Money Laundering: Sufficiency of the Evidence*

Ms. Christy challenges the sufficiency of the evidence for her money laundering convictions, specifically on the mens rea element of intent. After providing additional procedural and legal background, we review the record and conclude there was insufficient evidence of intent for a reasonable jury to find Ms. Christy guilty of money laundering beyond a reasonable doubt.

1. **Additional Procedural Background**

The jury found Ms. Christy not guilty of the four money laundering counts based on loan payments the Christys made before 2014 (Counts 14-17). The cash payments underlying Ms. Christy's six money laundering convictions (Counts 18-23) were made on two loans in the Christys' names at the Farmers State Bank in Aliceville, Kansas.

Count 18 charged Ms. Christy with money laundering for making a $1,000 payment on March 17, 2014 on Loan 7521, a home loan that originated in 2011 and called for a minimum monthly payment of $600. With one exception, a payment of $1,848 that was not charged in the indictment, every one of the Christys' payments on Loan 7521 in 2013 and 2014 was $1,000. Counts 19-23 concerned cash payments on Loan 7962, a refinancing agreement for the Christys' home loan.[13] Ms. Christy was convicted based on five cash payments on this loan made between March 17, 2014 and May 12, 2014, ranging from $834.49 to $3,200 and averaging approximately $2,167.

Ms. Christy filed a motion for acquittal on the money laundering counts at the close of the Government's case, arguing there was insufficient evidence to show that her loan payments were made with embezzled funds. She did not argue that there was insufficient evidence of specific intent. She renewed her motion at the end of trial. The district court denied the motion, stating,

> A reasonable jury could infer from the circumstantial
> evidence presented at trial that the cash used to make these
> loan payments came from funds that Ms. Christy had
> embezzled from the vault at CNB and that Ms. Christy

---

[13] It appears the Loan 7962 origination documents were never admitted into evidence.

> conducted the financial transactions with the intent to file a
> false income tax return in violation of 26 U.S.C. § 7206(1).

ROA, Vol. I at 337.

2. **Standard of Review**

In general, we review de novo whether there was sufficient evidence to support a defendant's convictions, *United States v. Cota-Meza*, 367 F.3d 1218, 1223 (10th Cir. 2004), viewing all the evidence and any reasonable inferences drawn therefrom in the light most favorable to the government, *United States v. Poe*, 556 F.3d 1113, 1124 (10th Cir. 2009). We consider all evidence, circumstantial and direct, but we do not weigh that evidence or consider the credibility of witnesses. *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013).

We will reverse a conviction for insufficient evidence only when no reasonable jury could find the defendant guilty beyond a reasonable doubt. *See Anaya*, 727 F.3d at 1050. But we will not uphold a conviction "that was obtained by nothing more than piling inference upon inference . . . or where the evidence raises no more than a mere suspicion of guilt." *Rufai*, 732 F.3d at 1188 (quotations omitted). "A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Id.* (quotations and brackets omitted).

Because Ms. Christy failed to raise her mens rea argument in her Rule 29 motion, we review the sufficiency issue for plain error. *Id.* at 1189.

> To establish plain error, [the appellant] must demonstrate the
> district court (1) committed error, (2) the error was plain, and
> (3) the plain error affected her substantial rights. If these
> factors are met, we may exercise discretion to correct the

41

error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Story*, 635 F.3d 1241, 1244 (10th Cir. 2011) (citations omitted).

As we have noted before, "[O]ur review for plain error in this context differs little from our de novo review of a properly preserved sufficiency claim" because "a conviction in the absence of sufficient evidence will almost always satisfy all four plain-error requirements." *United States v. Gallegos*, 784 F.3d 1356, 1359 (10th Cir. 2015) (citing *Rufai*, 732 F.3d at 1189); *see United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008). Accordingly, "review under the plain error standard in this case and a review of sufficiency of the evidence usually amount to largely the same exercise." *United States v. Duran*, 133 F.3d 1324, 1335 n.9 (10th Cir. 1998).[14]

3. **Legal Background**

a. *The money laundering statute and the elements of the offense*

Broadly defined, money laundering is "[t]he act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced." *Regalado Cuellar v. United States*, 553 U.S. 550, 558 (2008) (quoting Black's Law Dictionary 1027 (8th ed. 2004)). The federal money laundering statute, 18 U.S.C. § 1956, provides:

**§ 1956. Laundering of monetary instruments**

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of

---

[14] The Government states that we should review de novo whether there was sufficient evidence to support Ms. Christy's money laundering convictions. It does not argue for plain error review. Aplee. Br. at 36.

> unlawful activity, conducts or attempts to conduct such a
> financial transaction which in fact involves the proceeds of
> specified unlawful activity—
>
> (A)(i) with the intent to promote the carrying on of specified
> unlawful activity; or
> (ii) *with intent to engage in conduct constituting a violation of
> section 7201 or 7206 of the Internal Revenue Code of 1986*;
> or
>
> (B) knowing that the transaction is designed in whole or in
> part—
> (i) to conceal or disguise the nature, the location, the source,
> the ownership, or the control of the proceeds of specified
> unlawful activity; or
> (ii) to avoid a transaction reporting requirement under State or
> Federal law,
> shall be sentenced to a fine . . . or imprisonment for not more
> than twenty years, or both.

18 U.S.C. § 1956(a) (emphasis added). The charges against Ms. Christy were based on

the italicized language in § 1956(a)(1)(A)(ii), the tax-based money laundering

provision.[15]

At the trial, the district court instructed the jury that to find Ms. Christy guilty of

tax-based money laundering under § 1956(a)(1)(A)(ii), it

> must be convinced that the government has proved each of
> the following beyond a reasonable doubt:
>
> FIRST: Denise Christy conducted a financial transaction;

---

[15] Only § 7206 is at issue here. It penalizes any person who "[w]illfully makes and
subscribes any return, statement, or other document, which contains or is verified by a
written declaration that it is made under the penalties of perjury, and which he does not
believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1).

SECOND:  Denise Christy knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity;

THIRD:  The financial transaction involved the proceeds of bank embezzlement as set forth in Count 1; and

FOURTH:  Denise Christy conducted the financial transaction with the intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986.

ROA, Vol. I at 108.[16]  On appeal, Ms. Christy does not contest that the Government proved she paid loans with money that she knew she had embezzled from the Bank—the first three elements.  She contests whether the Government proved the fourth element, specifically whether she made the loan payments "with the intent" to violate the tax laws.  In short, she argues the evidence at trial was insufficient to prove intent.  We next address the intent required to violate § 1956(a)(1)(A)(ii).

b. *Mens rea under the statute*

The mens rea for 1956(a)(1)(A)(ii) is purpose or specific intent.  This is clear from the following discussion of the difference between general and specific intent, the text of § 1956(a)(1)(A)(ii), case law from our circuit, and other circuits' interpretation of the tax-based money laundering statute.  The Government therefore needed to show that Ms.

---

[16] The jury instruction tracked the statute, which includes both § 7201 and § 7206. The indictment charged Ms. Christy only with violations of § 7206, and the jury was not instructed on the elements of § 7201.  The Government proceeded on the money laundering charges based on § 7206 only.  In denying Ms. Christy's motion for acquittal on the money laundering charges, the district court relied on "the intent to file a false income tax return in violation of 26 U.S.C. § 7206(1)."  Dist. Ct. Doc. 70 at 17.

Christy made the charged loan payments with the purpose of furthering the false statements on her 2014 income tax returns.  *See United States v. Bailey*, 444 U.S. 394, 403-04 (1980).[17]

### i.  Mens rea, § 1956(a)(1)(A)(ii), and general and specific intent

A criminal conviction generally requires proof not only of a criminal act but also a guilty mind, or "mens rea."  *Torres v. Lynch*, 136 S. Ct. 1619, 1630-31 (2016); *Morissette v. United States*, 342 U.S. 246, 250-63 (1952).  The Supreme Court has "long recognized that determining the mental state required for commission of a federal crime requires construction of the statute and . . . inference of the intent of Congress."  *Staples v. United States*, 511 U.S. 600, 605 (1994) (quotations omitted).

The criminal act under § 1956(a)(1)(A)(ii) is "to conduct [] a financial transaction which in fact involves the proceeds of specified unlawful activity."  The financial transactions in this case were Ms. Christy's loan payments.  The statute requires proof of two types of mens rea.  First, under § 1956(a)(1), the defendant must "know[] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity."  Ms. Christy does not contest that the Government proved this knowledge element.  Second, under § 1956(a)(1)(A)(ii), the defendant must have conducted the financial transaction "with the intent to engage in conduct constituting a violation of section . . . 7206 of the Internal Revenue Code."  Ms. Christy contends the prosecution did not prove this intent element.

---

[17] As noted above, although Ms. Christy was not charged based on her 2014 tax return, Agent Schmidt testified that the Christys failed to report income on that return.

The common law has distinguished "general intent" and "specific intent" crimes. *Bailey*, 444 U.S. at 403 (1980). A crime's mens rea is "specific intent" when the prosecution must prove not only that the defendant voluntarily and intentionally committed the prohibited act but also intended to violate the law. *See Kawashima v. Holder*, 565 U.S. 478, 483 (2012); *Cheek v. United States*, 498 U.S. 192, 200-01 (1991); *United States v. Blair*, 54 F.3d 639, 642 (10th Cir. 1995) ("A specific intent crime is one in which an act was committed voluntarily and purposely with the specific intent to do something the law forbids." (quotations omitted)). General intent requires only an act "done voluntarily and intentionally, and not because of mistake or accident." *Blair*, 54 F.3d at 642 (quoting *United States v. Hall*, 805 F.2d 1410, 1420 (10th Cir. 1986)).

Federal criminal law and the Model Penal Code have gradually moved away from this terminology, replacing it with a mens rea "hierarchy," "commonly identified, in descending order of culpability, as [1] purpose, [2] knowledge, [3] recklessness, and [4] negligence." *Bailey*, 444 U.S. at 404; *see United States v. Hernandez-Hernandez*, 519 F.3d 1236, 1239 & n.3 (10th Cir. 2008). As the Supreme Court explained, "'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." *Bailey*, 444 U.S. at 405; *see* Model Penal Code § 2.02 (defining levels in mens rea hierarchy).

ii. Text

The language of § 1956(a)(1)(A)(ii)—"with intent to engage in conduct constituting a violation" of the tax laws—is phrased in specific intent terms. *See Carter v. United States*, 530 U.S. 255, 270-71 (2000) (explaining that "intent to steal or purloin"

signifies specific intent); *United States v. Welch*, 327 F.3d 1081, 1095 (10th Cir. 2003) (interpreting "intent to . . . promote" as requiring "a higher level of culpability than mere knowledge"). Although the defendant must "know[] the property involved in a financial transaction" was the product of "unlawful activity," § 1956(a)(1), "intent" in § 1956(a)(1)(A)(ii) requires more—that the defendant had the particular objective of filing a false tax return. That objective goes beyond simply using unlawful proceeds to conduct a transaction. The transaction itself must be performed for the purpose of filing a false tax return, a specific intent state of mind. The word "with" preceding "intent" shows the intent must be present at the time of the transaction and cannot be formed at some other time, such as when the defendant filed the false return.

The words "with intent to engage in conduct constituting a violation" of § 7206 do not call for proof that the financial transaction was just "done voluntarily and intentionally." *Blair*, 54 F.3d at 642. They require proof that it was done "to do something the law forbids," *id.*—violation of the tax laws. This is notable because a specific intent requirement typically applies to the law underlying the charged offense. But the crime here—tax-based money laundering under § 1956(a)(1)(A)(ii)—requires even more to prove the requisite mental state. The prosecution must prove that the criminal act—here the loan repayment—was done with the intent to violate another law—the statute prohibiting a false tax filing. This feature of § 1956(a)(1)(A)(ii) lends more support that it is a specific intent offense.

The language surrounding § 1956(a)(1)(A)(ii) provides even further support. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("[W]hen interpreting a statute . . . we construe

47

language . . . in light of the terms surrounding it."); *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1209 (10th Cir. 2014) (examining statute's "surrounding language" to aid in determining its meaning). The § 1956 money laundering statute uses the word "intent" in two provisions that are grouped together in the same subsection—§ 1956(a)(1)(A)(i) and (ii). (A)(i) requires proof that the financial transaction was conducted "with the intent to promote the carrying on of specified unlawful activity." The provision at issue here, (A)(ii), requires proof of "intent to engage in conduct constituting a violation of section . . . 7206."

The intent required in (A)(ii) is even more specific than the intent in (A)(i) because it itemizes particular statutory provisions. Although the case law interpreting (A)(ii) is sparse, cases interpreting (A)(i) hold that it is a specific intent provision. *See, e.g.*, *United States v. Carcione*, 272 F.3d 1297, 1302 (11th Cir. 2001) (interpreting § 1956(a)(1)(A)(i) as a specific intent crime); *United States v. Johnson*, 440 F.3d 1286, 1294 (11th Cir. 2006) (same).[18] The parallel language in the two provisions and their

---

[18] In addition, the Fifth Circuit has recognized (A)(i)'s "stringent" and "rigorous" mens rea requirement and has applied it to other subsections of the money laundering statute. *See United States v. Trejo*, 610 F.3d 308, 314-15 (5th Cir. 2010) (interpreting § 1956(a)(2)(A) to include the "stringent specific intent requirement" for other money laundering offenses). Like our sister circuits, we see no reason to interpret the specific intent element of the subsections differently. *See Rutledge v. United States*, 517 U.S. 292, 299 & n.10 (1996) (giving the same meaning to same words in different statutes); *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 786 n.17 (2000) ("[I]t is well established that a court can, and should, interpret the text of one statute in light of the text of surrounding statutes.").

adjacent pairing in the same subsection of § 1956 shows that tax-based money laundering is a specific intent crime.[19]

### iii. Tenth Circuit case law on money laundering and intent

This circuit has not addressed the tax-based money laundering provision in § 1956(a)(1)(A)(ii). But cases interpreting § 1956(a)(1)(B)(i) help to show why "intent" in § 1956(a)(1)(A)(ii) should be read to require proof of "specific intent" or "purpose."[20]

In *United States v. Sanders*, this court addressed the sufficiency of the evidence for a money laundering conviction under § 1956(a)(1)(B)(i), which prohibits transactions "designed . . . to conceal" the nature, location, ownership, or source of the ill-gotten funds. 929 F.2d 1466, 1472 (10th Cir. 1991). We rejected the "argument that the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity." *Id.* We did so because "the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." *Id.* Accordingly, "[w]e have repeatedly stated that

---

[19] The legislative history also supports a "specific intent" mens rea. The Senate Report on the Money Laundering Crimes Act of 1986 explained that tax-based money laundering "requires that the transaction be conducted with the *intent to facilitate* tax evasion." S. Rep. 99-433 at 11 (1986) (emphasis added).

[20] Rather than conflate tax-based and concealment-based money laundering cases, as the dissent alleges, Dissent Op. at 2, we note the absence of the former in Tenth Circuit case law and draw lessons from the latter.

49

§ 1956 is not a 'money spending statute.'" *United States v. Caldwell*, 560 F.3d 1214, 1222 (10th Cir. 2009) (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994)). Other circuits have agreed, in reliance on our decisions.[21]

In *Caldwell,* we also overturned the defendant's money laundering conviction under § 1956(a)(1)(B)(i) for insufficient evidence. *Id.* at 1223. There, the defendant distributed the proceeds of her wire-fraud scheme by writing checks to herself and her husband. *Id.* at 1221-22. To prove money laundering, we held that the government was required to produce evidence of intent to conceal. Using ill-gotten gains for routine financial transactions does not suffice. *Id.* at 1223; *see Sanders*, 929 F.2d at 1472-73 (overturning money-laundering conviction for insufficient evidence when defendant used ill-gotten gains to openly purchase cars without using a third-party intermediary).

On another occasion, in the context of § 1956(a)(1)(B)(i), we explained:

> Whenever a drug dealer uses his profits to acquire any asset—whether a house, a car, a horse, or a television—a jury could reasonably suspect that on some level he is motivated by a desire to convert his cash into a more legitimate form. The requirement that the transaction be "designed" to

---

[21] *See, e.g.*, *United States v. Corchado–Peralta*, 318 F.3d 255, 259 (1st Cir. 2003) ("[N]othing about the purchases, or their manner, points toward concealment or disguise beyond the fact that virtually *all expenditures* transform cash into something else."); *United States v. McGahee*, 257 F.3d 520, 527 (6th Cir. 2001) ("Paying for personal goods, alone, is not sufficient to establish that funds were used to promote an illegal activity."); *United States v. Majors*, 196 F.3d 1206, 1213 (11th Cir. 1999) ("subscrib[ing] to" our reasoning in *Garcia-Emanuel*); *United States v. Stephenson*, 183 F.3d 110, 120-21 (2d Cir. 1999) ("[A]bsent proof of intent to conceal, an ordinary purchase made with ill-gotten gains does not violate the money laundering statute."); *United States v. Herron*, 97 F.3d 234, 237 (8th Cir. 1996) (endorsing our reasoning in *Sanders*); *United States v. Dobbs*, 63 F.3d 391, 398 (5th Cir. 1995) (adopting our reasoning in *Garcia-Emanuel*).

conceal, however, requires more than a trivial motivation to conceal.

*Garcia-Emanuel*, 14 F.3d at 1474. Notably, the defendant in *Garcia-Emanuel* was also convicted of five counts of tax evasion but was not charged with tax-based money laundering under § 1956(a)(1)(A)(ii). *Id.* at 1471, 1472.

The need to prove purposeful intent to establish tax-based money laundering dovetails with the Tenth Circuit's well-established principle that "money laundering" is not "money spending." *See Caldwell*, 560 F.3d at 1221. We do not suggest the use of tainted proceeds to pay for goods, services, or loan payments can never violate § 1956(a)(1)(A)(ii), but more is required than proof of the payment. The prosecution must show that a purpose of the expenditures was to file a false tax return. Proof of unlawful purpose converts money spending to money laundering.

iv. <u>Out-of-circuit case law interpreting 18 U.S.C. § 1956(a)(1)(A)(ii)</u>

The First, Fifth, and Eleventh Circuits have upheld convictions under § 1956(a)(1)(A)(ii) when the defendants conducted their "financial transactions" with the purpose or specific intent of furthering their tax fraud. *See United States v. Zanghi*, 189 F.3d 71, 81 (1st Cir. 1999); *United States v. Crader*, No. 00-10337, 2001 WL 872711, at *1, *5 (5th Cir. July 2, 2001) (unpublished); *United States v. Suba*, 132 F.3d 662, 675 (11th Cir. 1988).

In *Zanghi*, the defendant engaged in securities fraud through an "S" Corporation to generate income. 189 F.3d at 75-76. He then transferred the proceeds of the fraud with checks from the "S" Corporation to himself, noting the money was for "loan

51

repayments." *Id.* at 76-77.[22] This characterization was false because he had not personally loaned money to the corporation. *Id.*

> Characterizing the [checks] as loan repayments allowed Zanghi to argue to [his company's] accountant that [the funds used for the checks] were originally deposited in [the company's] account as the proceeds of loans, not as the proceeds of the illegal sale of preferred shares in [the company] (which they in fact were)."

*Id.* at 81. By mischaracterizing the illegally obtained funds as loan repayments to himself rather than accurately labeling them as fraud-related profits, he concealed the income, and its source, on his tax forms. *Id.*

The First Circuit affirmed Mr. Zanghi's money laundering convictions. *Id.* It stated the elements of tax-evasion-based money laundering: the defendant must have (1) engaged in a financial transaction, (2) knowing it involved the proceeds of criminal activity, and (3) with the intent of engaging in conduct constituting tax fraud. *See id.* at 77-78. Interpreting the "intent" element, the district court had instructed the jury that it needed to find that Mr. Zanghi engaged in the financial transactions for the *sole* purpose of evading taxes. *Id.* at 77. On appeal, Mr. Zanghi argued that this legal interpretation was the law of the case and that the evidence was insufficient to satisfy the "sole purpose" standard. *Id.* at 79.

The First Circuit disagreed with this argument, correcting the district court's legal conclusion and explaining that "*exclusive* intent to evade taxes is not required." *Id.* at 78

---

[22] In *Zanghi*, the court "note[d] that § 1956 is relatively new and has been infrequently applied. There is little precedent elucidating its application." *Zanghi*, 189 F.3d at 78 n.5. Nearly a decade later, we can still state that § 1956(a)(1)(A)(ii) "has been infrequently applied." *Id.*

(emphasis added). It further explained that the jury could infer intent to engage in conduct constituting a violation of 26 U.S.C. § 7201—the specific intent element of § 1956(a)(1)(A)(ii)—based on "consistent patterns of understatement coupled with conduct tending to conceal." *Id.* at 80. In other words, a defendant need not conduct the financial transaction with the *sole purpose* of evading taxes, but tax evasion must be *a purpose* of the financial transaction, a holding consistent with the understanding that tax-based money laundering is a specific-intent crime. *Id.*

In *Crader*, the defendants ran a non-profit organization funded by federal grants. 2001 WL 872711, at *1. It provided services to persons afflicted with AIDS and HIV. *Id.* The indictment charged defendants with money laundering in connection with their scheme to overcharge clients and develop a "cash hoard" that they used to benefit themselves and to pay salaries and expenses of their favored clients. *Id.* The defendants then used the organization to distribute its ill-gotten gains to help themselves and their preferred employees evade taxes. *Id.* Specifically, they (1) issued checks in a third-party's name, (2) characterized checks as rent or reimbursements rather than income, (3) "failed to issue 1099's or W-2's to the ultimate beneficiaries of the checks," and (4) "directed the preparation of Forms 1099 and W-2 which reported taxable income under the names and tax identification numbers of the third party recipients rather than the actual recipients of the funds." *Id.* at *4. The defendants' "financial transactions" therefore directly affected their tax liability or the tax liability of their employees and the Fifth Circuit affirmed their tax-based money laundering convictions. *Id.*

53

In *Suba,* the Eleventh Circuit considered a 133-count indictment that included multiple types of money laundering. 132 F.3d at 665-67. It only briefly discussed the specific intent element of §1956(a)(1)(A)(ii). But the court affirmed the defendants' tax-based money laundering convictions when they deposited unlawful Medicare overcharges into Managed Risk accounts, distributed the accounts' funds to themselves as shareholders, and separately "forged the trustee's signature and endorsements and invested the proceeds in securities and real estate" to facilitate the scheme. *Id.* at 675. These facts are consistent with a purpose requirement for tax-based money laundering because shifting funds and using unwitting third parties concealed the nature of the defendants' transactions and enabled the filing of false tax returns. *Id.*

In each of these cases, the defendants used corporate entities to mischaracterize or conceal their financial transactions using ill-gotten gains. The transactions furthered the defendants' tax fraud by hiding the true source of the funds. In other words, the financial transactions had the purpose of furthering or facilitating the underlying tax crime.

\*    \*    \*    \*

In summary, based on the law defining specific and general intent, the text of § 1956(a)(1)(A)(ii), the Tenth Circuit cases establishing that money laundering is not money spending, and the out-of-circuit decisions requiring purpose or specific intent to violate § 1956(a)(1)(A)(ii), the Government needed to prove that Ms. Christy made her loan payments with the specific intent to violate the tax laws.

4. **Analysis**

The Government failed to produce sufficient evidence to establish that Ms. Christy made her loan payments with the purpose of enabling her to file false tax returns. The Government "does not contest that § 1956 is generally not a 'money spending statute.'" Aplee. Br. at 41 (quoting *Caldwell*, 560 F.3d at 1222). It nonetheless argues that two pieces of evidence convert Ms. Christy's loan payments from money spending into money laundering. First, the Government contends that Ms. Christy's "small-deposit transactions were designed precisely to disguise her six-figure embezzlement from CNB." *Id.* at 42. Second, it asserts that Ms. Christy's failure to report income when she filed her tax returns also established her intent to engage in tax fraud when she made her loan payments. Neither argument is convincing.

a. *Loan payments not evidence of specific intent*

The Government's first argument fails because the evidence does not show that Ms. Christy's loan payments were made to enable her to file false tax returns. *Zanghi* explained that concealing the nature of the transaction may suffice to establish contemporaneous "intent to engage in conduct constituting [willful tax evasion, i.e.,] a violation of section 7201." 189 F.3d at 79 (quoting 18 U.S.C. § 1956(a)(1)(A)(ii)) (alteration in original).[23] In that case, the government's evidence showed that the

---

[23] *Zanghi* recognized that evidence of concealment can be used to prove intent under § 1956(a)(1)(A)(ii) as well as § 1956(a)(1)(B)(i). At least one other court has agreed and applied "the same [mens rea for tax-based money laundering] as for concealment money laundering," requiring the government to "prove that the purpose of

defendant hid fraud-related income by labeling it as loan repayments. *Id.* at 81. Only by concealing the source of his money could he claim in his tax filings that he had no taxable income. *Id.*

Similarly, in *Crader*, "[t]he defendants aided the ultimate beneficiaries of the third-party checks in evading income taxes by issuing the checks in a third party's name, rather than in the name of the actual recipient, and by characterizing the payments as rent or reimbursements, rather than as salary or other income." 2001 WL 872711 at *4. In both cases, *a purpose* of the financial transactions underlying the money laundering charges was to mischaracterize or conceal the transaction in a way that altered the applicable tax-reporting requirements.

No comparable concealment or purpose appears in this case.[24] Ms. Christy's $1,000 payment on Loan 7521 (Count 18) was the exact same amount as 20 of the 21 payments she made in 2013 and 2014. As for Loan 7962, the Government did not

---

the transaction, and not merely the effect, was to violate 26 U.S.C. § 7206." *United States v. Shellef*, 732 F. Supp. 2d 42, 74 n.48 (E.D.N.Y. 2010).

    Although we agree that evidence of concealment may be used to establish the intent element of tax-based money laundering, the term "conceal" is not used in § 1956(a)(1)(A)(ii), as it is in § 1956(a)(1)(B)(i). Our discussion of "concealment" responds to the Government's argument that it proved intent with evidence of Ms. Christy's concealment. Aplee. Br. at 37-42 (using the word "conceal" or "concealment" 14 times).

[24] The Government argues that, to make her deposits more traceable, Ms. Christy could have deposited the cash into her own account and then transferred it to her loan servicer. *See* Aplee. Br. at 41-42. But, as Ms. Christy notes, "had [she] moved the cash deposits through more than one account, the government would argue that the very multiplicity of transactions indicated a design to conceal." Aplt. Reply Br. at 13.

introduce the loan documents into evidence, so there is no evidence that Ms. Christy's

payments were irregular relative to the terms of the loan and her prior payments. The

amounts of Ms. Christy's payments varied, but they still fell within a $2,400 range, and

none deviated from the average payment by more than $1,200. Nothing about the

frequency or size of the payments suggests Ms. Christy was attempting to conceal the

source of her income.

Based on the foregoing, the Christys' loan payments were neither unusual nor

suspicious. The embezzled funds could just have easily been spent on groceries, *see*

*United States v. Dobbs*, 63 F.3d 391, 397-98 (5th Cir. 1995) (overturning money

laundering convictions when illicit funds were used "to pay ranch and family expenses");

a new car, *see Sanders*, 929 F.2d at 1472; or on personal checks, *see Caldwell*, 560 F.3d

at 1222; none of which constitutes "concealment." *See Carter*, 530 U.S. at 269

(interpreting mens rea in criminal statute to avoid punishing "otherwise innocent

conduct").[25] Just as the purchases in *Sanders* and *Caldwell* were deemed "ordinary

commercial transactions" and the evidence failed to show they were designed to conceal

or disguise drug sale proceeds, Ms. Christy's loan payments also were ordinary

---

[25] At trial, Mr. Schmidt testified that if Ms. Christy had spent the embezzled money on "groceries, diapers, anything, that becomes money laundering." ROA, Vol. III at 501. The prosecutor also asked Mr. Schmidt, "[I]f I sell drugs and I've got 10,000 and I buy a new car, spending that money is money laundering?" *Id.* Mr. Schmidt answered "yes," but his answer plainly misstates the law of this circuit. *See Sanders*, 929 F.2d at 1472 (reversing money laundering convictions for purchasing vehicle with proceeds of drug sales). The Government echoed Mr. Schmidt's testimony at oral argument. *See* Oral Arg. at 24:43-26:40 (Government counsel arguing that Ms. Christy would be guilty of money laundering if she spent embezzled money on groceries).

commercial transactions and the evidence failed to show they were conducted to violate § 7206 of the tax code. Indeed, Ms. Christy's loan payments were "open and notorious" and exposed her illicit income stream. *Suba*, 132 F.3d at 675.

The Government has not shown that Ms. Christy's intent to make the loan payments rested on anything other than her contractual obligation to make them. *See United States v. McGahee*, 257 F.3d 520, 527-28 (6th Cir. 2001) (overturning money laundering convictions for payments on residence, personal loan, and car loan). She did not run the transaction through a third party, as in *Crader*. 2001 WL 872711 at *1. She did not lie about the source of the money, as in *Zanghi*. 189 F.3d at 76. Nor did she use a corporate affiliate to disguise the nature of her transactions, as in both *Crader*, 2001 WL 872711 at *1, and *Zanghi*, 189 F.3d at 76. Indeed, she made no representations regarding the source of the cash for her loan payments.[26] Nothing about the payments suggests they were made with the intent to further her tax fraud. *See Zanghi*, 189 F.3d at 78-79.

b. *False tax return not evidence of specific intent*

The Government is left with its second argument—that Ms. Christy "clearly had no intent to report the substantial increase in her income as a result of her embezzlement

---

[26] The dissent argues that Ms. Christy's cash payments made her transactions "difficult to trace" and allowed her "to obscure the source of the funds." Dissent Op. at 14. But the Aliceville Bank recorded every one of the Christys' transactions. As a result, the Government was able to obtain a full record of her deposits and introduce it at trial—apparently, the cash payments were "[easy] to trace."

from CNB, as evidenced by her failure to report the proceeds from her embezzlement as income." Aplee. Br. at 40.[27] In denying Ms. Christy's motion for acquittal, the district court similarly relied on Ms. Christy's "intent to file a false income tax return in violation of 26 U.S.C. § 7206(1)." ROA, Vol. I at 337.

The Government relies on *Zanghi*'s declaration that "[e]vidence that a taxpayer filed returns knowing that he should have reported more income than he did is sufficient to support a finding of willful intent to defeat and evade taxes." 189 F.3d at 78. But the quoted passage came in *Zanghi*'s discussion of the district court's jury instruction error on the requisite mens rea for 26 U.S.C. § 7201, not a discussion of the specific intent requirement of § 1956(a)(1)(A)(ii). *See id.* It is therefore inapplicable to the question presented here.

Ms. Christy's failure to report income on her tax filings does not show that she made the loan payments with the purpose of evading taxes. It shows she evaded taxes.

---

[27] As noted above, the loan payments occurred between March 17, 2014, and May 12, 2014. To the extent the Government's argument may stem from Ms. Christy's filing her 2014 return on March 12, 2015, it points to no evidence that the loan payments were made to facilitate filing a false return or that her mental state 10 months after the loan payments were made would tell the jury anything about her subjective thoughts when she paid the loans, much less establish specific intent.

To the extent the Government may wish to rely on Ms. Christy's loan payments happening at around the time when she filed her 2013 tax return, the jury would have to infer she was thinking about her taxes when she paid the loans, and then would have to infer from that inference that she paid the loans so that she could file a false return the next year. But this would be based on speculation and the "piling [of] inference upon inference" that fails to establish sufficiency. *Rufai*, 732 F.3d at 1188.

We further note that the Government has not explicitly made these arguments.

Congress made Ms. Christy's failure to report income on tax returns a separate crime under 26 U.S.C. § 7206(1), and she was sentenced for each of her six violations of that statute. She also was sentenced for her bank embezzlement in violation of 18 U.S.C. § 656. Apart from the evidence of those crimes, the Government (and the dissent) cannot point to evidence that shows Ms. Christy's specific intent to further her tax fraud by engaging in specified financial transactions, as required for a violation of § 1956(a)(1)(A)(ii). Accepting the Government's argument would require us to hold that every cash payment made with ill-gotten funds amounts to money laundering, provided the defendant also fails to report those funds when filing a tax return the next year.[28]

We decline to adopt such a sweeping interpretation. Instead, as we have done under other subsections of § 1956, we "reject the government's argument that the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity." *Sanders*, 928 F.2d at 946.

* * * *

---

[28] The dissent argues that "it is the *repeated* making of loan payments with illicit funds and the *repeated* failure to report those funds as income on her tax returns from which the jury could have reasonably inferred (as it did) that she made the subject loan payments with illicit funds so as not to have to report those funds as income." Dissent Op. at 13-14 (emphasis in original). This argument fails to explain why the loan payments are any different from repeated car payments, repeated grocery store trips, repeated electric bill payments, or any other repeated payment that we would otherwise consider "money spending." *See Garcia-Emanuel*, 14 F.3d at 1474.

The Government has produced insufficient evidence that a purpose for Ms. Christy's making the loan payments was to file false tax documents or to hide income from the IRS. Nothing about the loan payments concealed the source of the funds. She embezzled funds, filed false returns, and knowingly used embezzled funds to pay loans. But because the Government failed to produce adequate specific intent evidence, the loan payments were money spending, not money laundering. Accordingly, we reverse Ms. Christy's money laundering convictions.[29]

## C. *False Bank Entries—Jury Instruction*

Ms. Christy challenges her false bank entry convictions, arguing that the district court erred in failing to include a "materiality" element in its instruction to the jury. But even assuming 18 U.S.C. § 1005, the false bank entry statute, requires proof of a "materiality" element, we conclude that the district court's omission in this instance was harmless because Ms. Christy's false entries were material.

## 1. **Legal Background**

Federal law provides that "[w]hoever makes any false entry in any book, report, or statement of [a federally insured] bank . . . with intent to injure or defraud such bank . . . or to deceive any officer of such bank" is guilty of making a false bank entry. 18 U.S.C. § 1005.

---

[29] A sufficiency of the evidence challenge requires a court to determine whether the evidence was sufficient to prove what the law requires to constitute an offense. Drawing from Tenth Circuit and out-of-circuit cases, we have carefully spelled out what the law requires to prove the specific intent element of tax-based money laundering. The dissent cites no authority for its money laundering analysis and does not even mention the term "specific intent"—the mens rea the Government was required to prove.

61

The statute does not expressly state a materiality requirement. *See id.* But even when a statute includes an implied materiality element, a district court's failure to instruct the jury on that element is harmless if "the record contains [no] evidence that could rationally lead to a contrary finding with respect to the omitted element." *See Neder v. United States*, 527 U.S. 1, 19 (1999).

Materiality is an objective inquiry. *See TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) ("The question of materiality . . . is an objective one."); *United States v. Irvin*, 682 F.3d 1254, 1267 (10th Cir. 2012) (describing "materiality in the bank fraud context as an *objective* quality"). A false statement is material when it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quotations omitted). In assessing materiality, courts ask three questions:

(1) What statement was made?

(2) What decision was the decision maker considering?

(3) Was the statement capable of influencing the relevant decision?

*United States v. Williams*, 865 F.3d 1302, 1310 (10th Cir. 2017) (interpreting "materiality" under the bank fraud statute, 18 U.S.C. § 1344). In *Williams*, we found that the defendant's false statements in a loan application were material even though the bank ultimately did not issue him the loan because his "misrepresentations were *capable* of influencing the bank's decision." *Id.* at 1314 (emphasis added).[30]

---

[30] In *Neder*, the Supreme Court held that the bank fraud statute, 18 U.S.C. § 1344, requires proof of materiality. 527 U.S. at 25.

2. **Additional Background**

Ms. Christy's false bank entry convictions concerned her six false "sales" of cash from CNB Burlington to the FRB. She filled out and signed "cash-out" tickets that misrepresented the amount of money CNB Burlington had sent to the FRB. Her false sales to the FRB contained discrepancies of:

- $297,000 (Count 2)

- $400,000 (Count 3)

- $562,000 (Count 4)

- $270,000, $225,000, and $225,000 (collectively, Count 5)

- $300,000 (Count 6)

- $680,000 (Count 7)

Ms. Nabus discovered Ms. Christy's errors and prompted her to correct them, which she eventually did.

At trial, Ms. Christy objected to the jury instruction on the false bank entry charges, arguing that it should have included a requirement that "the [false bank] entry was material." ROA, Vol. I at 52. She did not provide a suggested definition of "material." The district court overruled the objection and instructed the jury that it must find four elements to convict Ms. Christy of violating 18 U.S.C. § 1005:

(1) CNB was a federally insured bank.

(2) Ms. Christy made a false entry in a book, record, or statement of CNB.

(3) Ms. Christy knew the entry was false when she made it.

63

(4) Ms. Christy made the false entry with the intent to deceive an officer of CNB.

3. **Standard of Review**

"[W]e review the jury instructions de novo and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Kalu*, 791 F.3d 1194, 1200-01 (10th Cir. 2015) (quotations omitted). "In doing so, we consider whether the district court abused its discretion in shaping or phrasing . . . a particular jury instruction and deciding to give or refuse a particular instruction." *Id.* (quotations omitted).

When a jury instruction erroneously omits an element of the offense, the government must prove harmless error by showing "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder*, 527 U.S. at 15. An error is harmless when "the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Id.* at 17.

4. **Analysis**

Neither the Supreme Court nor this court has addressed whether the false bank entry statute, 18 U.S.C. §1005, requires proof of materiality. Even if it does and if the district court erred in not instructing the jury on materiality, the Government can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder*, 527 U.S. at 15 (quotations omitted).

64

Ms. Christy's false bank entries were plainly material. They reported sales to the FRB containing discrepancies of between $297,000[31] and $680,000, and she signed the tickets and attempted to incorporate these discrepancies into the Bank's records. On the day of the audit, the vault should have contained $883,320. Mr. Snook testified that the vault's records showed it contained between $750,000 and $1,000,000 in the months leading up to the audit. Thus, even the smallest of the discrepancies ($297,000) in Ms. Christy's entries constituted more than 25 percent of the branch's total reported cash reserves—hardly immaterial. These facts are uncontroverted. Ms. Christy does not point to any countervailing evidence suggesting her false entries were immaterial. *See Neder*, 527 U.S. at 17.

Burlington CNB reasonably relied on these statements to maintain its records and manage cash reserves. Although Ms. Nabus promptly caught Ms. Christy's errors, as in *Williams*, Ms. Christy's "misrepresentations were capable of influencing the bank's decision[s]." 865 F.3d at 1314. At trial, Bank employees, including Mr. Snook, testified that they make business decisions based on the amount of cash in the vault at a given time. Leading up to the audit, he believed the Bank had too much money in its vault. If he had known the vault held only $119,320, it is implausible and inconceivable that he would have asked the Bank to reduce its reserves by approximately $400,000. Indeed,

---

[31] The smallest single false entry was $225,000, but that entry was combined with two others in Count Five, for a total of $720,000. But whether we consider $225,000 or $297,000 to be Ms. Christy's smallest discrepancy, our materiality analysis is the same.

such a reduction would have been impossible. To say that losing one quarter of its cash reserves is not capable of influencing a bank's decisionmakers defies reason.

The verdict was "supported by overwhelming evidence." *See Neder*, 527 U.S. at 17. The Government can show beyond a reasonable doubt that a jury instruction as to materiality would not have affected the outcome at trial. *See id.* We therefore affirm Ms. Christy's false bank entry convictions.

## III. **CONCLUSION**

In sum, we (1) reject Ms. Christy's prosecutorial misconduct challenge because she has not shown the prosecutor's comments influenced the jury's verdict; (2) reverse Ms. Christy's money laundering convictions because the Government did not produce sufficient evidence of the intent to file a false tax return; and (3) affirm Ms. Christy's false-bank-entry convictions because, even assuming materiality is an implied element of 18 U.S.C. § 1005, its omission from the jury instruction was harmless error. We remand to the district court with instructions to vacate the convictions for money laundering, resentence the defendant, and proceed in accordance with this opinion.

Case No. 17-3122 *United States v. Christy*
**O'BRIEN**, J., concurring in part, dissenting in part.

I agree with the Majority's opinion in all respects but two.

First, it says reversing the money laundering counts (incorrectly, in my view[1])

excuses any need to address an issue warranting decision. The issue is whether the

district judge erred in failing "to address [Christy] personally" regarding allocution.

---

[1] The Majority concludes a remand for resentencing is warranted based on its reversal of the money laundering counts (Counts 18-23). While I disagree with the reversal (my second point), it does not require a resentencing hearing. A simple amendment to the judgment voiding the money laundering counts would suffice, leaving the allocution issue viable.

Christy's advisory sentencing guideline range was calculated based exclusively on the bank embezzlement count which, as a result of grouping under USSG § 3D1.2, comment. (n.6), resulted in an advisory guideline range of 46 to 57 months imprisonment on all counts except the declaring false tax returns counts, which carried a statutory maximum sentence of 36 months, *see* 26 U.S.C. § 7206(1). The judge sentenced Christy to (1) 51 months imprisonment and three years of supervised release on the bank embezzlement and false bank entries counts, (2) 51 months in prison and three years of supervise release on the money laundering counts, and (3) 36 months imprisonment and one year of supervised release on the false tax returns counts. He ordered the sentences to run concurrent with each other. As a result, Christy's sentence will remain 51 months in prison and three years of supervised release even without the money laundering counts. Moreover, although the judge ordered restitution in the amount of $857,708, that amount arose solely from the bank embezzlement and filing false tax returns counts. The money laundering counts played no role in that calculation.

Theoretically, on resentencing the judge could vary downward from the advisory guideline range because the money laundering counts are no longer part of the equation. But my review of the record reveals Christy's sentence—both the guideline range and the ultimate sentence—to rest on the embezzlement/false bank entries counts, with the other counts as mere tag-alongs. A variance might, in theory, be conceivable, but it appears highly improbable in the penetrating light of reality.

Moreover, should another opportunity to allocute be appropriate at re-sentencing I have every confidence that the district judge would be accommodating. Other than justifying a refusal to decide the allocution issue, I see no reason for us to insist upon a second opportunity to allocute or even mention it.

(Majority Op. at 2 n.1 (quotations marks omitted)).  The trial judge adequately addressed and advised her, and we should say so.

The issue was fully briefed and argued.  I disagree with Christy's assumption of error and even more so with her undifferentiated reading of *United States v. Bustamante-Conchas*, 850 F.3d 1130 (10th Cir. 2017) (en banc).  The judge personally addressed Christy, first informing her of the right to speak and then offering her that opportunity.  She said she understood her right to allocute and later, through counsel, declined the invitation.  As I will later fully explain, Christy's allocution rights were not abused and *Bustamante-Conchas* does not inform this debate; it involved the <u>complete denial of allocution</u>.

Second, the government produced sufficient evidence to convict Christy of tax-based money laundering.  Her repeated use of illicitly obtained funds to pay down her loans and her repeated failure to report those funds as income on her tax returns demonstrate one of her purposes (intent), if not the principle one, was to violate the tax laws.  *See United States v. Zanghi*, 189 F.3d 71, 78-79 (1st Cir. 1999).  In concluding otherwise, the Majority fails to consider evidence and reasonable inferences to be drawn therefrom, which adequately support the jury's verdict.  The Majority's reasoning also conflates tax-based money laundering under 18 U.S.C. § 1956(a)(1)(A)(ii) with concealment-based money laundering under 18 U.S.C. § 1956(a)(1)(B)(i).

A. *Allocution*

The common law recognized a defendant's right to allocute at sentencing.  That right required "the defendant [to] be personally afforded the opportunity to speak before

imposition of sentence." *Green v. United States*, 365 U.S. 301, 304 (1961) ("As early as 1689, it was recognized that the court's failure to ask the defendant if he had anything to say before sentence was imposed required reversal."). Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) codifies the right: "Before imposing sentence, the court must . . . address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence."[2] Christy claims the judge violated the rule. He did no such thing. She waived her right to allocute.

At the beginning of the sentencing hearing, the judge personally and directly addressed Christy:

> You do have a right—under the rule that governs this hearing, you have a right to make a statement. You are not required to make a statement, but you do have that right. And later in the hearing, I'll call on you to hear any statement you choose to make. Make sense to you?

(R. Vol. 3 at 977.) She indicated she understood. As promised, later in the hearing the judge returned to Christy's right to make a statement: "So now, Mr. Biebighauser [defense counsel], I turn to the question of an allocution statement. *Does Ms. Christy*

---

[2] The rule explains, in clear language, why addressing the defendant is necessary: "in order to" permit the defendant to speak or present information in mitigation. "In order to" could also be phrased as "so that." *See* https://www.thesaurus.com/browse/in%20order%20to. Either way the language requires a one-on-one exchange between the judge and the defendant and then it explains why a personal communication is necessary—so the defendant may allocute, if she wishes. I am at a loss to divine some coded message requiring anything more. The judge met the call—he explained the purpose of allocution to Christy, one on one, in words she could, and did, understand. He later afforded her the opportunity to do so.

It would be better for the judge to speak directly to the defendant throughout the exchange, rather than relying on counsel. But it is beyond our ken to impose best practices; our office is only to insure the minimum requirements of the rule are met.

wish to make a statement in the nature of allocution at this time?" (*Id*. at 1012 (emphasis added).) Significantly, the question to counsel was not, "Do you have something more to offer?" Instead, and clearly, it was, "Does your client want to make a statement?" The attorney responded, "No, Judge." (*Id*.) In light of that abundantly clear answer, the judge concluded, "All right. Then the record should show that she has *waived that opportunity*." (*Id*. (emphasis added).) Neither Christy nor her attorney uttered a word of protest. The judge was right; the waiver was complete.

I can envision only two possible claims of error. Perhaps, with Christy at his side, defense counsel flagrantly lied to the judge, something we ought be loath to presume, especially on a sparse record. Perhaps it was a miscommunication between Christy and counsel. In either event, Christy's remedy, if any, should be grounded in post-conviction review under 28 U.S.C. § 2255 where the salient issue—was counsel ineffective, willfully or otherwise—can be addressed on a fully developed record.[3] Unless we presume counsel cannot answer a binary question for his client (and in her presence), facts matter: sometimes they really matter and are easily obtained. If her lawyer accurately relayed her answer ("I do not want to make a statement") to the judge, she waived a known right. An intricate dance to the rhythm of Fed. R. Crim. P. 32(i)(4)(A)(ii) is unnecessary, entertaining as it may be.

---

[3] While, on its own, "an allocution error does not provide grounds for habeas relief," *Bustamante-Conchas*, 850 F.3d at 1135 n.1, an attorney's deficient representation, if prejudicial, may. Indeed, ineffective assistance of counsel claims should generally be brought in collateral proceedings, rather than on direct appeal. *United States v. Galloway*, 56 F.3d 1239, 1240-41 (10th Cir. 1995) (en banc).

But even ignoring her waiver, Christy's failure to object at sentencing entitles her only to plain error review. *Bustamante-Conchas*, 850 F.3d at 1137 (reaffirming that unpreserved allocution errors are subject to plain error review). She admits as much, arguing the judge plainly erred in failing to comply with Rule 32(i)(4)(A)(ii). The government concedes the first three prongs of plain error review—(1) error, (2) that is plain, which (3) affects substantial rights—are satisfied. *Id.* (setting forth the four prongs of plain error review). As a result, Christy focuses on the fourth prong, which, absent two "unusual circumstance[s]," is satisfied by a complete denial of allocution. *Id.* at 1142. Because the unusual circumstances *Bustamante-Conchas* mentioned in its analysis of the fourth prong are not present here, she presumes the judge committed plain error. But *Bustamante-Conchas* has no place in our reckoning. It involved <u>the complete denial of allocution</u>. This case, on the other hand, does not. Even under plain error review she fails on all prongs.[4]

For an error to be plain, it must be "clear [or obvious] at the time of the appeal." *United States v. Smith*, 815 F.3d 671, 675 (10th Cir. 2016); *see also United States v. Wolfname*, 835 F.3d 1214, 1221 (10th Cir. 2016). An error is clear or obvious "when it is contrary to well-settled law." *Smith*, 815 F.3d at 675 (quotation marks omitted). "For us to characterize a proposition of law as well-settled, we normally require precedent *directly in point* from the Supreme Court or our Circuit or a consensus in the other

---

[4] Although the government conceded the first three prongs of plain error review were satisfied, "[w]e possess the discretion to reject what is, in effect, a stipulation on a question of law by the government." *Bustamante-Conchas*, 850 F.3d at 1141 n.7 (quoting *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993)).

circuits." *Id*. (emphasis added). *Bustamante-Conchas* is not on point.

Stare decisis, a venerable tenet of the common law, has been carefully woven into American jurisprudence. Rightfully so; it serves important purposes. Among others, it is egalitarian—the law, once announced, does not change, case by case. It also makes the law predictable—reliance on stable law enables people and legal entities to comfortably plan their affairs. It is efficient—eliminating the need to repeatedly offer a detailed explanation for a proposition earlier laid to rest. But, if not carefully applied, it can pervert otherwise admirable ends. In the words of Justice Cardozo: "Judges march at times to pitiless conclusions under the prod of a remorseless logic which is supposed to leave them no alternative. They deplore the sacrificial rite. They perform it, none the less, with averted gaze, convinced as they plunge the knife that they obey the bidding of their office." Benjamin N. Cardozo, The Growth of the Law 66 (1924).

Relief from stifling regularity lies in another tenet of the common law, also carefully woven into American jurisprudence. In applying precedent, judges may, sometimes must, distinguish the case at bar from an earlier one, which, at least seemingly, announces a hard and fast rule. Doing so restricts like treatment to genuinely like matters. That lesson is a worthy one, well-illustrated by cases in another context (qualified immunity) decrying similarities drawn at a high level of generality. *See, e.g.*, *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1152 (2018); *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 590 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

In summary and practice, the threads of stare decisis are appropriately entangled with the opposing, but no less imposing, threads of exception. When applied together in a principled way, they are the warp and the woof of a legal tapestry and together they ameliorate the risk of unintended consequences.

In *Bustamante-Conchas*, neither before nor after announcing a tentative sentence did the judge "'address the defendant personally in order to permit [him] to speak or present any information to mitigate the sentence.'" 850 F.3d at 1137 (quoting Fed. R. Crim. P. 32(i)(4)(A)(ii)). As the en banc court made clear <u>no less than six times</u>, that case involved the "complete denial of allocation." *Id*. at 1133-34, 1138, 1140, 1142, 1144. A complete denial of allocation satisfies the first two prongs of plain error review, it said, because it is contrary to well-settled law from our Circuit as well as the Supreme Court which requires a judge to afford the defendant an opportunity to personally speak on his own behalf prior to imposition of the sentence. *Id*. at 1137-38 (citing *Hill v. United States*, 368 U.S. 424, 426 (1962), and *United States v. Landeros-Lopez*, 615 F.3d 1260, 1264 (10th Cir. 2010)). We also decided a complete denial of allocation will generally satisfy the third and fourth prongs of plain error review except in some specifically-delineated circumstances. *Id*. at 1140, 1142-43. This markedly different case is not within its orisons.

Here, Christy could have, had she chosen to do so, "personally engage[d]" with the judge, presenting "mitigating circumstances" and "personal characteristics" which would have "enable[d] [him] to craft an individualized sentence" and "avoid[ed] the appearance of . . . assembly-line justice." *Id*. at 1136 (quotation marks omitted) (noting

the important ends served by allowing a defendant to personally address the sentencing court).  With full knowledge of her right to allocute, she, in the presence of and through her attorney, simply declined to do so.

That the judge posed the question of allocution to defense counsel, rather than Christy, is of no moment when placed in context.  "Rule 32 provides a defendant with two rights: 'to make a statement in his own behalf, and to present any information in mitigation of punishment.'"  *Id*. at 1135 (quoting *Green*, 365 U.S. at 304).  "Because the former entitlement is necessarily personal," we said, "a district court cannot discharge its duties under Rule 32 by permitting counsel to offer argument in mitigation" as even "'the most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.'"  *Id*. at 1135-36 (quoting *Green*, 365 U.S. at 304).  In this case, even though the judge asked counsel whether Christy wished to allocute, the invitation was personal to her—"*Does Ms. Christy* wish to make a statement in the nature of allocution at this time?"  (R. Vol. 3 at 1012 (emphasis added).)  In other words, the judge was offering Christy the opportunity to personally address him, not merely asking if counsel wanted to speak on her behalf.[5]  And because the invitation to

---

[5] Christy suggests an allocution query directed at counsel is insufficient.  In addition to *Green* and *Bustamante-Conchas*, she relies on *United States v. Adams*, 252 F.3d 276, 279 (3d Cir. 2001).  But *Adams* hardly represents a "consensus" in the other circuits necessary to constitute "well-settled law" for purposes of satisfying the first and second prongs of plain error review.  *See Smith*, 815 F.3d at 675 (quotation marks omitted).  In any event, after ruling on Adams' objections to the presentence report, the judge asked, "Anything else?"  252 F.3d at 278 (quotation marks omitted).  Defense counsel replied, "Do you want to hear me as far as sentencing is concerned?"  *Id*. (quotation marks omitted).  The judge responded, "I want to hear what you want to say about that, of course.  And then I want to hear if the remorseful defendant has anything

speak (and Christy's response) came before the judge announced the sentence, tentative or otherwise, no error occurred, much less plain error.  *See United States v. Valdez-Aguirre*, 861 F.3d 1164, 1165 (10th Cir. 2017) ("By definition, allocution is to take place before the sentence is imposed.  Otherwise, the defendant would have little to gain from making a statement.").

In *Bustamonte-Conchas*, we decided a defendant need not proffer a proposed allocution statement in order to satisfy the fourth prong of plain error review.  850 F.3d at 1143-44.  We concluded such written statement could not adequately portray the defendant's "sincerity and credibility" or "speak for a defendant as the defendant might, with halting eloquence, speak for himself."  *Id*. at 1136, 1144 (quotation marks omitted).  But we need not fret over the difficulty of deciding what Christy might have said, had she decided to speak, or its probable impact on the sentencing judge.  Those issues are

_____

he wants to say."  *Id*. (quotation marks omitted).  After defense counsel and the government presented their arguments, the judge then asked defense counsel, "Okay.  Would your client like to exercise his right of allocution?"  *Id*. (quotation marks omitted).  Counsel said "No."  *Id*. (quotation marks omitted).

The Third Circuit concluded the judge's allocution query was insufficient because "the Supreme Court has held that [an allocution] query, directed towards counsel, does not satisfy the requirement that the district court personally address the defendant himself."  *Id*. at 279.  In support, the *Adams* court cited *Green*.  *Id*.  But, in *Green*, the sentencing court merely asked, "Did you want to say something?" and it was unclear from the record whether the question was directed to defendant or counsel.  365 U.S. at 302, 304-05 (quotation marks omitted).  The Court admonished that "merely affording *defendant's counsel the opportunity to speak* [would not] fulfill[] . . . Rule 32" and "[t]rial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant."  *Id*. at 304-05 (emphasis added).  In this case, the judge did not merely afford defense counsel the opportunity to speak on Christy's behalf.  Instead, he expressly told Christy of her right to speak and later extended her a personal invitation to speak prior to imposing sentence.  Defense counsel was merely the intermediary.

nowhere present here. This case involves not what might have been said, or how. The only issue is whether defense counsel lied or otherwise erred. This is a run of the mill issue uniquely suited to a § 2255 proceeding where the rubber meets the road and facts, not presumptions, prevail.

We should treat this issue for what it is—a contrived "gotcha" moment—raised for the first time on appeal and being milked for leverage. If counsel was ineffective, resulting in a waiver of his client's rights, the remedy lies with a 28 U.S.C. § 2255 motion. Otherwise, it should suffer a quiet demise.

B. *Money Laundering*

In Counts 18-23, Christy was charged and convicted of tax-based money laundering, 18 U.S.C. § 1956(a)(1)(A)(ii), based on six cash deposits she made to two loan accounts from March 17, 2014, to May 12, 2014 ("the loan payments"). The jury was told that to convict Christy of these counts, it must find, beyond a reasonable doubt, she made the loan payments with funds she knew were proceeds from her bank embezzlement and "with the intent to engage in conduct constituting a violation of section 7201 and 7206 of the Internal Revenue Code of 1986." (R. Vol. 1 at 224, 226, 228, 230, 232, 234.) The money laundering instructions did not define what conduct was prohibited by §§ 7201 and 7206.

But Christy was also indicted with six counts (Counts 8-13) of declaring false tax returns for tax years 2009-2014 in violation of § 7206 of the Internal Revenue Code. With regard to those counts, the jury was instructed § 7206 "makes it a crime for anyone willfully to make a false material statement on an income tax return." (*Id*. at 204, 206,

208, 210, 212, 214.) The false statement in this case was underreporting her income by failing to include her embezzled funds as income. Melding these instructions with those relating to the money laundering counts, the jury was told not to convict Christy of money laundering, unless it found, beyond a reasonable doubt, the loan payments were made with funds she knew to be proceeds from her bank embezzlement and with the intent not to report those funds as income on her tax returns.

Unlike in the district court, Christy does not here dispute the sufficiency of the evidence demonstrating the loan payments to have been made with funds she knew were embezzled. She now contends only that the evidence was insufficient to show the loan payments were made with the intent to avoid reporting the embezzled funds as income on her 2015 tax return. The Majority agrees, saying the government's evidence failed to show Christy made the loan payments with any intent other than to satisfy her contractual obligation to make them. It relies in large part on the neither unusual nor suspicious (in size or frequency) nature of the loan payments and the absence of any overtly conspicuous attempt by Christy to disguise or conceal the payments. In the end, the Majority concludes the government's evidence proved no more than the payments were made with illicit funds, which is "money spending" not "money laundering." I see it differently.

As stated above, in addition to the money laundering counts, Christy was charged with six counts of declaring false tax returns for tax years 2009-2014. These counts were based on her failure to report over $400,000 in embezzled funds as income on those returns. In support of these counts, the government presented the testimony of an IRS

agent who examined her bank accounts as well as her tax returns during that time period. The examination revealed Christy and her husband having made over $400,000 in unexplained cash deposits to their bank accounts, including to their loan accounts, all of which they failed to report as income on their 2009-2014 tax returns. The jury convicted Christy on these counts. As a result, the jury had before it evidence that at the time she made the loan payments which formed the basis for Counts 18-23 (March-May 2014), she had four times before (2009-2012) made similar payments with funds she failed to report as income. Not only that, at about the same time she made the March-May 2014 loan payments, she filed her 2013 return, which also failed to report the funds used to pay down her loans as income. Her systematic and repeated conduct permits a reasonable inference that her purpose in making the March-May 2014 loan payments was to make use of embezzled funds without revealing their source and the accompanying purpose of not reporting the funds as income on her 2014 tax return (which would have necessarily aroused suspicion about her embezzlement), i.e., to file a false tax return.

The Majority myopically discounts this evidence, saying Christy's failure to report the loan payments as income on her 2014 tax return does not show she made them with the purpose of evading taxes. Were it to find otherwise, it says, then every cash payment with ill-gotten funds amounts to money laundering, provided the defendant also fails to report those funds when filing a tax return the next year. Not so. It is the intent to violate the tax laws which differentiates simply making a cash payment with illicit funds (money spending) with money laundering. Admittedly, a single failure to report as income illicit funds used in making cash payments might not sufficiently show that a payment made

- 12 -

with those funds was done with an intent to evade taxes. However, <u>multiple</u> failures to report, as income, illicit funds so used supports a reasonable inference that such a current payment was motivated by, or at least included, an intent to avoid reporting those funds as income. "Past behavior is the best predictor of future behavior." *United States v. Estrada-Lozano*, 221 F. App'x 742, 749 n.9 (10th Cir. 2007) (unpublished). Notably, the jury did not convict Christy of the money laundering counts (Counts 14-17) based on four cash deposits she made to Loan 7521 in July and September 2011 and in January and October 2012. At the time she made the October 2012 payment, she had filed only three false tax payments (2009-2011); at the time she made the 2011 payments and January 2012 payment, only two (2009-2010).

In a similar vein, the Majority concludes we cannot rely on Christy's having made the loan payments around the time when she filed her 2013 tax return because such reliance would constitute "speculation and conjecture" and the "piling [of] inference upon inference" which is not enough to support a conviction. *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (quotation marks omitted). According to it, the jury would have to infer Christy was thinking about her taxes when she made the loan payments and then infer from that inference that she paid the loans so that she could file a false return the next year. But I do not rely solely on the fact she made the loan payments around the time she filed her 2013 tax return. Rather, it is the <u>repeated</u> making of loan payments with illicit funds and the <u>repeated</u> failure to report those funds as income on her tax returns from which the jury could have reasonably inferred (as it did) that she made the subject loan payments with illicit funds so as not to have to report those funds as

income. That aside, a reasonable inference could be drawn as to her making the loan payments around the time she filed her 2013 tax return—at the time she made loan payments with the embezzled funds, she realized reporting the embezzled funds as income would alert authorities to her illegal activities and end her lucrative scheme. She could not, with impunity, report those funds as income the next year; following her pattern was essential to avoiding detection, so she acted just as she had in previous years. It is quite common, in fact, to think about the tax consequences when conducting a financial transaction (i.e., making a charitable contribution, deciding how much to contribute to a retirement plan, or deciding whether to pay off a mortgage). That is the nature of taxes—activity is generally not reported until the year after it occurs.

The Majority also makes much of the fact that Christy's deposits were "open and notorious" and exposed her illicit income stream. (Majority's Op. at 57.) I beg to differ.

Each of the loan payments in Counts 18-23 (as well as the other payments not charged in the indictment) were made in cash, which is difficult to trace and allowed her to obscure the source of the funds. Those cash payments eventually caught up to her, but they served a clearly intended purpose for several years (and probably would have continued to do so had her embezzlement not been discovered). Concealment and other suspicious activity might well serve as proof of an intent to violate the tax laws, but their absence, at least in this case, does not demonstrate lack of criminal intent. Rather it reveals a successful scheme to make the transactions look as "normal" as possible. Moreover, nothing in the tax-based money laundering provision, 18 U.S.C. § 1956(a)(1)(A)(ii), requires such concealment or suspicious activity. In contrast, the

concealment-based money laundering provision, 18 U.S.C. § 1956(a)(1)(B)(i), does. That provision, like the tax-based money laundering provision, prohibits a defendant from conducting a financial transaction with property known to represent the proceeds of some unlawful activity. However, unlike the tax-based money laundering provision, which requires an intent to violate the tax laws, the concealment-based money laundering provision requires the defendant know that the financial transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *See* 18 U.S.C. § 1956(a)(1)(B)(i). Christy was neither indicted nor convicted of the concealment-based money laundering provision.

The jury was presented with abundant evidence and was correctly instructed on the law. I see no practical reason to narrow our focus to evidence related to a particular count without acknowledging and accounting for established patterns of behavior. I am satisfied that the jury did precisely what it was called upon to do: evaluate all of the evidence and permissible inferences as a whole in arriving at a verdict, count by count. I would affirm.